Anne L. Weismann
D.C. Bar No. 298190
Melanie Sloan
(D.C. Bar No. 434584)
Daniel C. Roth
(MA Bar No. 661021)
(*pro hac vice* motion submitted)
Citizens for Responsibility
  and Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C. 20005
202-408-5565

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON 1400 Eye Street, N.W., Suite 450 Washington, D.C. 20005,  :  :  :  :  :  Plaintiff,  :  :  v.  :  :  MARGARET SPELLINGS, Secretary, U.S. Department of Education 400 Maryland Avenue, SW Washington, D.C. 20202,  :  :  :  :  :  and  :  :  U.S. DEPARTMENT OF EDUCATION 400 Maryland Avenue, SW Washington, D.C. 20202,  :  :  :  :  :  Defendant.  :  : | Civil Action No._____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.  This is an action under the Federal Advisory Committee Act, 5 U.S.C. App. §§ 1, <u>et</u>.

seq. ("FACA"), as amended, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, challenging the failure of the Department of Education ("DOE") to comply with FACA's open meetings and disclosure requirements in the operation of advisory committees created pursuant to the Reading First provisions (20 U.S.C. §§ 6361, et. seq.) of the No Child Left Behind Act of 2001, 20 U.S.C. §§ 7231, et. seq., as amended.  These advisory committees are composed of education experts from the academic, nonprofit, government, and corporate sectors, and were created by Congress to review state applications for federal grants under the Reading First Initiative and provide recommendations to the Secretary of Education as to which programs should be funded.  20 U.S.C. § 6363(2).

2.  This case seeks declaratory relief that Defendants are in violation of FACA for failing to charter the Reading First advisory committees, ensure that committee meetings are open to the public, make committee records available for public inspection and keep public minutes of committee proceedings.  5 U.S.C. App. §§ 9(c), 10.  Plaintiff also seeks injunctive relief enjoining Defendants from utilizing, consulting, or obtaining information or advice from the advisory committees until Defendants comply fully with FACA.

## Jurisdiction and Venue

3.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702, which gives the Court jurisdiction over agency actions where an aggrieved party has suffered wrong within the meaning of a "relevant statute," here FACA.   Venue lies in this district under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703.

**Parties**

4.  Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue Code, and is committed to protecting the right of citizens to be informed about the activities of government officials and to ensuring the integrity of government officials through transparency in government processes.  CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process.  To advance its mission, CREW uses a combination of research, litigation, advocacy, and public education.  As part of its research, CREW uses government records and information made available to it under various federal disclosure statutes including the FACA and the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").

5.  CREW has invested considerable organizational resources in pushing the U.S. government to take ethics issues seriously.  CREW monitors closely the laws and rules applicable to government agencies, including the Department of Education.

6.  Defendant Department of Education is an agency within the meaning of 5 U.S.C. App. § 3 and 5 U.S.C. § 702.  Defendant is the federal agency required by statute to convene and receive advice from an expert panel as to how Reading First funds should be allocated nationwide.  20 U.S.C. § 6363(c).  Defendant has possession and control of the requested records and is responsible for fulfilling Plaintiff's request for information under FACA § 10(b).  See Food Chemical News v. Dep't of Health and Human Services, 980 F.2d 1468 (D.C. Cir. 1992).

7.  Defendant Margaret Spellings is the Secretary of the Department of Education, is sued

in her official capacity only, and is charged with, *inter alia*, making a formal determination that the formation of an advisory committee is in the public interest, 5 U.S.C. App. § 9(a)(2), ensuring compliance with advisory committee formation, composition, and staffing guidelines, <u>id</u>. at § 5(c), establishing "uniform administrative guidelines and management controls" for advisory committee, <u>id</u>. at § 8(a), and obtaining a FACA charter before the advisory committee meets or takes any action, 5 U.S.C. App. § 9(c)(2).

8. Defendant's violations of FACA injure CREW.  By failing to conduct open meetings and make advisory committee materials publicly available in the manner required by FACA, defendants are violating CREW's statutory rights to obtain information concerning these committees and their recommendations and to disseminate that information to the public.  Absent this critical information, CREW cannot advance its mission of educating the public to ensure that the public continues to have a vital voice in government decisions.

9. CREW will analyze the information it receives when Defendants comply with FACA to augment the public record regarding improprieties in the administration of the Reading First grant process as documented in the Final Inspection Report of the Department of Education's Office of Inspector General, ED-OIG/113-F0017 (September 2006) ("IG Report") (attached as Exhibit A), and news reports, and will share it with the public through memoranda, reports, or press releases.

10. In addition, CREW will disseminate any documents it acquires from its request to the public through its website, <u>www.citizensforethics.org</u>.  Currently, the CREW website contains links to thousands of pages of documents acquired from multiple FOIA requests.  <u>See</u>, <u>e.g.</u>,

http://www.citizensforethics.org/activities/campaign.php?view=130.  Visitors to CREW's

website can peruse the FOIA request letters, responses from government agencies and a growing

number of responsive documents.  The CREW website also includes documents relating to this

case, as well as CREW's FOIA litigation, Internal Revenue Service complaints, Federal Election

Commission complaints and Department of Justice complaints.

## STATUTORY FRAMEWORK
### The Federal Advisory Committee Act

11.  FACA imposes a number of requirements on committees that are established or

utilized by the President or federal agencies to obtain advice or recommendations ("advisory

committees").  5 U.S.C. App. §§ 2 et. seq.  FACA defines "advisory committee," in relevant part

to include any "committee, board, commission, council, conference, panel, task force, or other

similar group, or any subcommittee or other subgroup thereof . . . which is (A) established by

statute . . . or . . . (C) established or utilized by one or more agencies, in the interest of obtaining

advice or recommendations for . . . one or more agencies or officers of the Federal Government."

5 U.S.C. App. § 3(2).

12.  Advisory committees that meet this definition are subject to FACA's requirements

unless specifically exempted by statute, id. at § 4, or unless all of the committee members are

full-time or permanent part-time government officers or employees.  Id. at § 3(2)(C)(i).

13.  Each advisory committee subject to FACA must file a charter setting forth the

committee's objective, activities, and duties before taking any action.  Id. at § 9(c)(2).

14.  FACA requires that provisions be made to assure that "the advice and

recommendations of the advisory committee will not be inappropriately influenced by the

appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." Id. at §§ 5(b)(3), 5(c).

15. Under FACA, advisory committees must provide advance notice of any meetings and open their meetings to the public, id. at § 10(a), unless the agency head determines that the meeting may be closed to the public in accordance with the Government in the Sunshine Act, 5 U.S.C. § 552(b)(c). 5 U.S.C. App. § 10(d). All meetings must be chaired or attended by an officer or employee of the Federal Government authorized to adjourn any meeting when he or she deems adjournment in the public interest. Id. at § 10(e).

16. FACA also requires advisory committees to make available for public inspection all "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee," to the extent they are not subject to one of the exemptions in FOIA. Id. at § 10(b); Food Chemical News, 980 F.2d at 1472-73. Advisory committees must keep and disclose detailed meeting minutes for every meeting that include "a record of the persons present, a complete and accurate description of the matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the advisory committee," along with a signed certification of the minutes. 5 U.S.C. App. § 10(c). If an advisory committee does not disclose all or part of the minutes of any meeting, it must produce a written determination by the agency head that includes reasons for the non-disclosure. Id. at § 10(d).

-6-

## FACTS GIVING RISE TO PLAINTIFF'S CLAIMS FOR RELIEF

17.  On January 8, 2001, through the No Child Left Behind Act, Congress enacted the
Reading First Initiative as an amendment to the Elementary and Secondary Education Act of
1965 ("ESEA"), 20 U.S.C. §§ 7801 et. seq.  See 20 U.S.C. § 6362.  The purpose of the Initiative
was "[t]o provide assistance to State educational agencies and local educational agencies in
establishing reading programs . . . that are based on scientifically based reading research."  20
U.S.C. § 6361(1).

18.  The legislation provided for the creation of a panel to evaluate state Reading First
grant proposals and recommend to the Secretary of Education whether or not to approve funding.
20 U.S.C. § 6363(c).  20 U.S.C. § 6363 provides that the Secretary of Education, in consultation
with the National Institute for Literacy ("NIFL"), shall convene a panel to evaluate funding
applications and that the panel, at a minimum, shall include three individuals selected by the
Secretary, three individuals selected by NIFL, three individuals selected by the National Research
Council of the National Academy of Sciences ("NAS") and three individuals selected by the
National Institute of Child Health and Human Development ("NICHD").  Nothing in the
legislation exempts the Reading First panels from compliance with FACA.

19.  In response, DOE established an expert review panel consisting of at least three
individuals from each of the four organizations designated in 20 U.S.C. § 6363(c)(2)(A).  IG
Report at 6.  DOE then created 16 subpanels of five panelists each to review state applications
and recommend either approval or disapproval of the applications to the Secretary.  Id.

-7-

20. Based on concerns that the use of subpanels would not be in compliance with law, high-level DOE officials recommended that DOE create a 12-member Advisory and Oversight Panel to examine the work of the subpanels. Id. The Advisory and Oversight Panel was to consist of individuals selected by DOE, NIFL, NAS and NICHD. Id. Nevertheless, the Advisory and Oversight Panel was not created. Id. at 6-7.

21. On May 13, 2002, then-Secretary of Education Rod Paige named publicly 72 Reading First review panelists who would be tasked with reviewing state applications for Reading First grants. Press Release, Paige Announces Names of Experts Who Will Review Reading First Applications; $900 Million in Reading First Grants to Go to States (May 13, 2002) (attached as Exhibit B). The panelists were described as "expert reading researchers and education practitioners from around the country" and, as described, none was a full-time or permanent part-time government employee. Id.

22. On information and belief, both the expert review panel mandated by the ESEA and the 16 subpanels established by the Secretary of DOE include members who were not full-time or permanent part-time government employees. See IG Report; Michael Grunwald, Billions for Inside Game on Reading, *The Washington Post*, October 1, 2006 (attached as Exhibit C).

23. In September 2006, DOE's Office of Inspector General issued a Final Inspection Report on the Reading First Program's Grant Application Process. The IG Report concluded that DOE's administration of the Reading First Initiative was not guided by scientifically-based procedures and violated the ESEA, in addition to other federal regulations. IG Report at 1-2.

24. The IG Report also found that the advisory panels were not constituted in compliance with the ESEA, made some state grants without appropriate documentation, imposed evaluation criteria not included in the ESEA, and were composed and managed in contravention of Government Accountability Office management standards. IG Report; *see also* Grunwald, *The Washington Post*, Oct. 1, 2006; Sam Dillon, <u>Report Says Education Officials Violated Rules in Awarding Initiative Grants</u>, *The New York Times*, September 23, 2006 (attached as Exhibit D). The Inspector General determined that DOE did not have an effective conflict-of-interest screening process and failed to follow its own peer review guidance. IG Report at 1.

25. With respect to the composition of the advisory panels, the IG Report found that of the 16 subpanels that reviewed grant applications, 15 had a majority of DOE-selected panelists and seven were selected entirely by DOE. IG Report at 6. "None of the subpanels included a representative from each of the nominating organizations, and there is no indication that the subpanels ever met as one large panel to review the State applications and/or recommend approval or disapproval to the Secretary." <u>Id</u>.

26. After the Inspector General issued his report, Secretary of Education Margaret Spellings acknowledged that "individual mistakes" were made in DOE's administration of Reading First prior to her tenure as Secretary. <u>Press Release, U.S. Department of Education, Statement from Secretary Spellings on Inspector General's Report</u> (September 22, 2006) (attached as Exhibit E). She committed to address and resolve those mistakes and "move swiftly to enact all of the Inspector General's recommendations." <u>Id</u>.

27. On November 3, 2006, CREW contacted Joseph Conaty, Director of the Academic Improvement and Teacher Quality Programs at DOE, by telephone and email, to determine whether the Reading First panels were conducted in compliance with FACA. See email from CREW counsel Daniel C. Roth to Joseph Conaty, U.S. Dept. of Education (November 3, 2006) (attached as Exhibit F). To date, CREW has received no response to these inquiries from Mr. Conaty or any other DOE representative.

28. On November 6, 2006, CREW sent a letter to Secretary Spellings requesting all information required by the disclosure and open meetings provisions of FACA. See Letter from Melanie Sloan, Executive Director, CREW, to Margaret Spellings, Secretary of Education (November 6, 2006) (attached as Exhibit G). To date, CREW has received no response from Secretary Spellings, Mr. Conaty, or any representative of DOE to this letter.

29. On information and belief, DOE has taken no steps to ensure that the Reading First panels were conducted in compliance with the public disclosure and open meeting provisions of FACA, 5 U.S.C. App. § 10.

30. On information and belief, DOE has not filed a FACA charter for any of the Reading First panels.

## PLAINTIFF'S CLAIMS FOR RELIEF
### CLAIM ONE
#### (Failure to Produce Records)

31. Plaintiff realleges and incorporates by reference all preceding paragraphs.

32. Plaintiff properly requested records within the Department of Education's control.

33. Plaintiff is entitled by law to access to the records requested under FACA, unless Defendant makes an explicit and justified statutory exemption claim pursuant to FOIA's exemptions, 5 U.S.C. § 552.

34. Therefore, by failing to release the records as Plaintiff specifically requested, Defendant violated FACA's requirement that agency records be made available to the public. 5 U.S.C. App. § 10(b); See also Food Chemical News v. Dep't of Health and Human Services, 980 F.2d 1468, 1472 (D.C. Cir. 1992) ("section 10(b) [of the FACA] affirmatively obligates the Government to provide access to identified materials").

35. As a result of DOE's unlawful conduct, Plaintiff was denied access to all Reading First "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee," to the extent those records are not subject to one of the exemptions of FOIA. Id.

## CLAIM TWO

### (Failure to Comply with Open Meetings and Disclosure Provisions of FACA)

36. Plaintiff realleges and incorporates by reference all preceding paragraphs.

37. DOE's use of advisory panels to make recommendations to the Secretary of Education on funding for Reading First grants without complying with the open meeting and disclosure provisions of FACA, 5 U.S.C. App. § 10, is arbitrary, capricious and contrary to law.

38. As a result of DOE's unlawful conduct, Plaintiff was denied advance notice of and an opportunity to attend meetings of the Reading First panels.

-11-

## CLAIM THREE

### (Failure to Publish a FACA Charter)

39.  Plaintiff realleges and incorporates by reference all preceding paragraphs.

40.  DOE did not draft and publish a charter before operating the Reading First advisory committees, as required by FACA.  See 5 U.S.C. App. § 9(c).

41.  As a result of DOE's unlawful conduct, Plaintiff was denied information regarding: (A) the committee's official designation; (B) the committee's objectives and the scope of its activity; (C) the period of time necessary for the committee to carry out its purposes; (D) the agency or official to whom the committee reports; (E) the agency responsible for providing the necessary support for the committee; (F) a description of the duties for which the committee is responsible, and, if such duties are not solely advisory, a specification of the authority for such functions; (G) the estimated annual operating costs in dollars and man-years for such committee; (H) the estimated number and frequency of committee meetings; (I) the committee's termination date, if less than two years from the date of the committee's establishment; and (J) the date the charter was filed.  5 U.S.C. App. § 9(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1)  Declare that Defendants have violated the Federal Advisory Committee Act with respect to the Reading First panels;

(2)  Declare that Defendants' policy of noncompliance with FACA is arbitrary, capricious and contrary to law;

-12-

(3)  Order DOE to respond to Plaintiff's request under 5 U.S.C. App. § 10(b);

(4)  Order DOE to immediately release all records responsive to Plaintiff's request, subject to the appropriate exemptions under FOIA, 5 U.S.C. § 552;

(5)  Declare that DOE has violated § 10(b) of the Federal Advisory Committee Act by failing to lawfully satisfy Plaintiffs' request for information of November 6, 2006;

(6)  Order DOE to publish notice in advance of all future meetings of the Reading First panel;

(7)  Award Plaintiff its reasonable attorney fees and litigation costs in this action, pursuant to 5 U.S.C. § 552(a)(4)(E);

(8)  Enjoin Defendants from utilizing, consulting, or obtaining information or advice from Reading First panels until Defendants comply fully with all provisions of FACA, including the drafting of a charter; and

(9)  Grant such further and additional relief as the Court may deem just and proper.


Respectfully submitted


Dated: December 7, 2006

_____/s/ Anne L. Weismann_____
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Daniel C. Roth
(MA Bar No. 661021)
(*pro hac vice* motion submitted)
Citizens for Responsibility and

-13-

(3)  Order DOE to respond to Plaintiff's request under 5 U.S.C. App. § 10(b);

(4)  Order DOE to immediately release all records responsive to Plaintiff's request,

subject to the appropriate exemptions under FOIA, 5 U.S.C. § 552;

(5)  Declare that DOE has violated § 10(b) of the Federal Advisory Committee Act by

failing to lawfully satisfy Plaintiffs' request for information of November 6, 2006;

(6)  Order DOE to publish notice in advance of all future meetings of the Reading First

panel;

(7)  Award Plaintiff its reasonable attorney fees and litigation costs in this action,

pursuant to 5 U.S.C. § 552(a)(4)(E);

(8)  Enjoin Defendants from utilizing, consulting, or obtaining information or advice from

Reading First panels until Defendants comply fully with all provisions of FACA, including the

drafting of a charter; and

(9)  Grant such further and additional relief as the Court may deem just and proper.


Respectfully submitted

Dated: December 7, 2006

Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Daniel C. Roth
(MA Bar No. 661021)
(*pro hac vice* motion submitted)
Citizens for Responsibility and

-13-

Ethics in Washington
1400 "Eye" St., NW, Suite 450
Washington, DC  20005
Phone: (202) 408-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

**EXHIBIT A**

# The Reading First Program's Grant Application Process

## FINAL INSPECTION REPORT



**ED-OIG/I13-F0017**
**September 2006**

Our mission is to promote the
efficiency, effectiveness, and
integrity of the Department's
programs and operations.

U.S Department of Education
Office of Inspector General
Washington, D.C.

Statements that managerial practices need improvements, as well as other conclusions and recommendations in this report represent the opinions of the Office of Inspector General.  Determinations of corrective action to be taken will be made by the appropriate Department of Education officials.


In accordance with the Freedom of Information Act (5 U.S.C. § 552), reports issued by the Office of Inspector General are available, if requested, to members of the press and general public to the extent information contained therein is not subject to exemptions in the Act.

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ........................................................................1

BACKGROUND ....................................................................................4

INSPECTION RESULTS ........................................................................6

    **FINDING 1A –**    **The Department Did Not Select the Expert Review Panel in Compliance With the Requirements of NCLB**........................................................................6

    **FINDING 1B –**    **While Not Required to Screen for Conflicts of Interest, the Screening Process the Department Created Was Not Effective** ................................7

    **FINDING 2A –**    **The Department Did Not Follow Its Own Guidance For the Peer Review Process** ..............................8

    **FINDING 2B –**    **The Department Awarded Grants to States Without Documentation That the Subpanels Approved All Criteria**....................................11

    **FINDING 3 –**    **The Department Included Requirements in the Criteria Used by the Expert Review Panels That Were Not Specifically Addressed in NCLB** ...............12

    **FINDING 4 –**    **In Implementing the Reading First Program, Department Officials Obscured the Statutory Requirements of the ESEA; Acted in Contravention of the GAO *Standards for Internal Control in the Federal Government*; and Took Actions That Call Into Question Whether They Violated the Prohibitions Included in the DEOA** ......................13

RECOMMENDATIONS..........................................................................27

DEPARTMENT COMMENTS ................................................................28

OBJECTIVES, SCOPE, AND METHODOLOGY .................................33

Final Report
ED-OIG/I13-F0017                                                                                     Page 1

## EXECUTIVE SUMMARY

The objectives of our inspection were to:

1.  Determine if the Department of Education (Department, ED, or USDE) selected the
    expert review panel in accordance with the No Child Left Behind Act of 2001 (NCLB),
    Section 1203(c) and if the Department adequately screened the panel members for
    possible conflict of interest issues;

2.  Determine if the expert review panel adequately documented its reasons for stating that
    an application was unready for funding; and

3.  Determine if the expert review panel reviewed the applications in accordance with
    established criteria and applied the criteria consistently.

The selection of the expert review panel was not in compliance with the law because the
Department failed to ensure that each State application was reviewed by a properly constituted
panel.

Although not required, the Department developed a process to screen expert review panelists for
conflicts of interest; however, the Department's process was not effective. We identified six
panelists whose resumes revealed significant professional connections to a teaching methodology
that requires the use of a specific reading program. The Department did not identify any of these
connections in its conflict of interest screening process; therefore, it would not have been in a
position to deal with the potential conflict raised by these connections should a State have
included this program in its application.

The expert review panel adequately documented its reasons for stating that an application was
unready for funding; however, the Department substituted a Department-created report for the
panel's comments. As a result, the Department did not follow its own guidance for the peer
review process. Therefore, States did not have the benefit of the expert review panel's
comments and were not always able to quickly or effectively address problems in their
applications. Additionally, we found that five of the State applications we reviewed were funded
without documentation that they met all of the criteria for approval. The Department has not
provided any documentation that would indicate the subpanels approved the final applications
for these States.

The expert review panel appears to have reviewed the applications in accordance with criteria
developed by the Department and applied the criteria consistently; however, the criteria
developed by the Department included language that was not based on the statutory language.
As a result, State applications were forced to meet standards that were not required by the statute.

Final Report
ED-OIG/I13-F0017                                                                                              Page 2

In the course of answering our three objectives, we found that Department officials obscured the statutory requirements of the Elementary and Secondary Education Act of 1965 (ESEA), as amended by NCLB; acted in contravention of the Government Accountability Office's (GAO) *Standards for Internal Control in the Federal Government*; and took actions that call into question whether they violated the prohibitions included in the Department of Education Organization Act (DEOA). The DEOA at §3403(b) prohibits Department officials from exercising any direction, supervision, or control over the curriculum or program of instruction of any educational institution, school, or school system.

Specifically, we found that the Department:

- Developed an application package that obscured the requirements of the statute;
- Took action with respect to the expert review panel process that was contrary to the balanced panel composition envisioned by Congress;
- Intervened to release an assessment review document without the permission of the entity that contracted for its development;
- Intervened to influence a State's selection of reading programs; and
- Intervened to influence reading programs being used by local educational agencies (LEAs) after the application process was completed.

These actions demonstrate that the program officials failed to maintain a control environment that exemplifies management integrity and accountability.

We recommend that the Assistant Secretary for the Office of Elementary and Secondary Education (OESE):

1) Develop internal management policies and procedures for OESE program offices that address when legal advice will be solicited from the Office of the General Counsel (OGC) and how discussions between OGC and the program staff will be resolved to ensure that programs are managed in compliance with applicable laws and regulations.
2) In consultation with OGC, evaluate OESE's processes for assessing potential conflict of interest questions, when a panel review process is used, and make those improvements necessary to strengthen the processes.
3) Review all Reading First applications to determine whether all criteria for funding have been met.
4) Review the management and staff structure of the Reading First program office and make changes, as appropriate, to ensure that the program is managed and implemented consistent with the statutory requirements of NCLB.
5) Request that OGC develop guidance for OESE on the prohibitions imposed by §3403(b) of the Department of Education Organization Act.
6) When similar new initiatives are approved by Congress, rely upon an internal advisory committee, which includes representatives from other OESE programs, OGC, and the Department's Risk Management Team, to provide feedback on program implementation issues and ensure coordination in the delivery of similar or complimentary Department programs.

7) Rely upon the internal advisory committee to:
    a.  Determine whether the implementation of Reading First harmed the Federal interest and what course of action is required to resolve any issues identified; and
    b.  Ensure that future programs, including other programs for which the Department is considering using Reading First as a model, have internal controls in place to prevent similar problems from occurring.

8) Convene a discussion with a broad range of state and local education representatives to discuss issues with Reading First as part of the reauthorization process.

# BACKGROUND

The ESEA, as amended by NCLB on January 8, 2002, established the Reading First program. The purpose of NCLB is to "close the achievement gap with accountability, flexibility, and choice, so that no child is left behind."

Title 1, Part B, Section 1201 of the ESEA provides five purposes for the Reading First program:

1) To provide assistance to State educational agencies (SEAs) and LEAs in establishing reading programs for students in kindergarten through grade 3 that are based on scientifically based reading research (SBRR), to ensure that every student can read at grade level or above not later than the end of grade 3.
2) To provide assistance to SEAs and LEAs in preparing teachers, including special education teachers, through professional development and other support, so the teachers can identify specific reading barriers facing their students and so the teachers have the tools to effectively help their students learn to read.
3) To provide assistance to SEAs and LEAs in selecting or administering screening, diagnostic, and classroom-based instructional reading assessments.
4) To provide assistance to SEAs and LEAs in selecting or developing effective instructional materials (including classroom-based materials to assist teachers in implementing the essential components of reading instruction), programs, learning systems, and strategies to implement methods that have been proven to prevent or remediate reading failure within a State.
5) To strengthen coordination among schools, early literacy programs, and family literacy programs to improve reading achievement for all children.

Title 1, Part B, Section 1208(6) of the ESEA defines SBRR as research that:

(A) applies rigorous, systematic, and objective procedures to obtain valid knowledge relevant to reading development, reading instruction, and reading difficulties; and
(B) includes research that —
   (i) employs systematic, empirical methods that draw on observation or experiment;
   (ii) involves rigorous data analyses that are adequate to test the stated hypotheses and justify the general conclusions drawn;
   (iii) relies on measurements or observational methods that provide valid data across evaluators and observers and across multiple measurements and observations; and
   (iv) has been accepted by a peer-reviewed journal or approved by a panel of independent experts through a comparably rigorous, objective, and scientific review.

The ESEA does not advocate any particular reading program, assessment, or other product. In fact, Section 9527(b) of the ESEA prohibits the Department from endorsing, approving, or sanctioning any curriculum.

Title 1, Part B, Section 1002(b)(1) of the ESEA authorized an appropriation for Reading First of $900,000,000 for fiscal year 2002 and "sums as may be necessary for each of the 5 succeeding fiscal years." The appropriations for fiscal years 2003, 2004, 2005, and 2006 were $993,500,000, $1,023,923,000, $1,041,600,000, and $1,029,234,000, respectively.

Reading First funds are allotted to SEAs by formula according to the proportion of children aged 5 to 17 who reside within the State and are from families with incomes below the poverty line. SEAs submit applications to the Department to receive Reading First funding. SEA applications are reviewed by an expert review panel and are required to meet all statutory requirements before being awarded funds.

The Department's Office of Elementary and Secondary Education administers the Reading First program. Two Department officials, the Reading First Director and an Education Program Specialist (the Reading First Director's assistant), were responsible for administering the Reading First application process and, through the date of this report, continued to administer all facets of the Reading First program.

Final Report
ED-OIG/I13-F0017                                                                                    Page 6

# INSPECTION RESULTS

## FINDING 1A – The Department Did Not Select the Expert Review Panel in Compliance With the Requirements of NCLB

Our objective was to determine if the Department selected the expert review panel in accordance with Title 1, Part B, Section 1203(c) of the ESEA, which specifically describes the panel selection process. Section 1203(c)(2)(A) states that the Secretary, in consultation with the National Institute for Literacy (NIFL), shall convene a panel to evaluate applications and that, at a minimum, the panel shall include: three individuals selected by the Secretary, three individuals selected by NIFL, three individuals selected by the National Research Council of the National Academy of Sciences (NAS), and three individuals selected by the National Institute of Child Health and Human Development (NICHD). We have determined that each of the four organizations nominated at least three individuals to serve on the expert review panel; however, the Department failed to ensure that each State application was reviewed by a properly constituted panel.

Section 1203(c)(2)(C) requires a panel to recommend grant applications to the Secretary for funding or for disapproval. After selecting the panelists, the Department created subpanels made up of five panelists each to review the State applications and recommend either approval or disapproval to the Secretary. None of the subpanels possessed adequate representation from each of the organizations identified under Section 1203(c)(2)(A) of the Act.

The Department created a total of 16 subpanels to review the State applications. A majority of the panelists were nominated by the Department for 15 of the 16 subpanels; and 7 of the 16 subpanels consisted entirely of Department-selected panelists. None of the subpanels included a representative from each of the nominating organizations and there is no indication that the subpanels ever met as one large panel to review the State applications and/or recommend approval or disapproval to the Secretary.

Prior to forming these subpanels, a Department official expressed concern that the use of subpanels would not be in compliance with the law. As a result, OGC and high-level Department officials, including the Assistant Secretary for OESE at the time,[1] approved a plan for the Department to create a 12-member "Advisory and Oversight Panel" that would consist of three individuals selected by the Department, three individuals selected by NIFL, three individuals selected by NAS, and three individuals selected by NICHD, as required by the Act. The Advisory and Oversight Panel's duties would include examining the progress of the subpanels, reviewing the recommendations of the subpanels, and making the final funding recommendation to the Secretary, thus ensuring a common, high level of quality and consistency across the subpanels. Although the Assistant Secretary for OESE and OGC officials agreed

---

[1] This official left the Department in January of 2003 and for purposes of consistency and clarity will be referred to in this section simply as "the Assistant Secretary for OESE."

upon this approach, the Advisory and Oversight Panel was never created. To date, no one in the Department has offered an explanation of why this was not done.

Section 1203(c)(1) states: "The Secretary shall approve an application of a State educational agency under this section only if such application meets the requirements of this section." Because the Department did not meet the requirements at Section 1203(c)(2)(A), it raises the question of whether any of the applications were approved in compliance with the law.

## FINDING 1B – While Not Required to Screen for Conflicts of Interest, the Screening Process the Department Created Was Not Effective

Our objective was to determine if the Department adequately screened the panel members for possible conflict of interest issues. NCLB does not require panel members to be screened for conflict of interest. However, the Department decided to screen potential panelists for conflicts of interest and developed and implemented a process to do so. That process was not effective.

To assist with developing the screening process, an OGC ethics attorney provided sample conflict of interest questions to the Reading First Director's assistant. These questions were based on questions used to screen for conflicts in the "Agreement for Grant Application Reviewers Who Receive Compensation" used for discretionary grants.

The Reading First office incorporated most of these sample questions into the conflict of interest form it provided to potential Reading First panelists. This form asked each individual to provide his or her personal information, dates of availability, and answers to six questions. Five of the six questions focused on conflicts related to States' applications and/or States' Reading First programs. The other question focused on conflicts related to the potential panelists' financial interest in commercial products.

The Department's conflict of interest form did not incorporate one of the sample questions provided by an OGC ethics attorney. This question was: "Are you aware of any other circumstances that might cause someone to question your impartiality in serving as a reviewer for this competition?"

An OGC ethics attorney informed us that the screening process was designed to exclude individuals who had financial connections to products or programs or who had the appearance of a conflict of interest. This attorney also informed us that OGC's review of potential conflicts was informal and that OGC's role was to provide guidance rather than decisions. We did determine that when potential panelists identified specific connections to programs, assessments, or textbooks on the conflict of interest form, the OGC ethics attorney provided appropriate guidance, and the Department took appropriate action.

The potential panelists also provided the Department with resumes. The Department did not review the resumes as part of the conflict of interest screening process. We reviewed the resumes of 25 of the approved panelists and identified six panelists whose resumes revealed significant professional connections to a teaching methodology that requires the use of a specific reading program. The Department did not identify any of these connections in its conflict of

interest screening process; therefore, it would not have been in a position to deal with the potential conflict raised by these professional connections should a State have included this program in its application.

## FINDING 2A – The Department Did Not Follow Its Own Guidance For the Peer Review Process

Our objective was to determine if the expert review panel adequately documented its reasons for stating that an application was unready for funding. Section 1203(c) of the ESEA, under the heading "Peer Review," states that the panel will recommend grant applications to the Secretary for funding or disapproval. The Department created the *Reviewer Guidance for the Reading First Program* (Reviewer Guidance), which describes the process by which panelists will review applications and provide their comments. The Reviewer Guidance, which the Department provided to panelists, states that it is the reviewer's responsibility to provide a rating for each review criterion and constructive strength and weakness comments on the Technical Review Form. The guidance states that the panel chair will complete an additional summary sheet, called the Panel Chair Summary, which will reflect a consensus rating and supporting comments for each criterion. The guidance also states that the Panel Chair Summary will provide an overall consensus recommendation for approval or disapproval of the application.

The *Guidance for the Reading First Program* (Reading First Guidance), provided to States in April 2002, states that the expert review panel will "recommend clarifications or changes deemed necessary to improve the likelihood of the plan's success." The Reading First Guidance also states that SEAs "will have an opportunity to address the issues and concerns raised by the expert panel reviewers."

The panelists adequately documented their reasons for stating that an application was unready for funding. The panelists recorded their individual comments on the Technical Review Forms, and then met to discuss these comments. The panel chair then entered a consensus rating on a Panel Chair Summary, which was submitted to the Department's Reading First office. The Panel Chair Summary appeared to contain constructive comments to support the panel's ratings.

While the Panel Chair Summaries appeared to provide constructive comments, the impact of the expert review panelists' comments on State revisions is uncertain because of actions taken by the Department's Reading First office. After the panel chair submitted the Panel Chair Summaries to the Reading First office, the Reading First Director and his assistant created what they called an "Expert Review Team Report." This report was provided to the States. No other documents reflecting the expert review panel's comments were provided to the States. The Department did not explain this practice in the Reviewer Guidance or in the Reading First Guidance.

We have not found any documentation that the Department informed panelists that the Reading First Director and his assistant would write the report sent to SEAs. In fact, in e-mails to panelists the Reading First Director wrote that panelists "should look very closely at the exact panel comments made on the panel chair summary form as these comments drove the SEA's resubmission." Likewise, we have not found any documentation that the Department informed

States that they would receive a Department-written report rather than the expert review panel's direct comments.

The Reviewer Guidance states: "the conference call between the panelists and the SEA that will take place after the review of the SEA's application has been established so that the State may receive direct feedback from the expert review panel." In actuality, only the Reading First Director and his assistant conducted these calls. By conducting these conferences and writing the document that was sent to the SEA, the Reading First Director and his assistant cut off any direct contact between States and the expert review panelists and effectively controlled the feedback States received on their applications.

Prior to the first round of conference calls with States, the Reading First Director e-mailed the then Assistant Secretary for OESE[2] seeking guidance on the inclusion of panel chairs on the conference calls. The Reading First Director stated that "it's generally been mentioned to the States that they would hear directly from the Panel" but that the Department would "lose a bit of control" and the Panel Chair might say things that would "*complicate* matter [sic]" if included on the conference calls. In an earlier e-mail to the Assistant Secretary for OESE, the Reading First Director stated that "in remarks to groups...or face-to-face meetings about what the Review Panel will/won't accept the opportunities for BOLDNESS and, perhaps, extralegal requirements are many." [Emphasis in original.] We have not found any documentation that the Department informed panel chairs that they would not participate in the conference calls as outlined in the Reviewer Guidance. The Reading First Director's assistant stated that the expert review panelists were not included in the conference calls because it was too difficult to schedule.

According to the Reading First Director, he and his assistant created the Expert Review Team Reports to give States a distilled, organized version of the panel's comments that would show them which areas they needed to address. However, we found the Department's Expert Review Team Reports were not always accurate representations of the expert review panelists' comments. The Reading First Director and his assistant changed panelists' comments, left off others, and added comments of their own. In a number of cases, the Department generalized or omitted specific questions or suggestions. In other situations the Department's Expert Review Team Report exaggerated or misstated the panelists' concerns.

The following are specific examples of these practices from the twelve State application files that we reviewed.

### Nevada

Nevada submitted its application five times prior to receiving approval. The Panel Chair Summary for Nevada's first submission suggested that the State access *A Consumer's Guide to Evaluating a Core Reading Program* (Consumer's Guide), a guide for evaluating programs authored by Edward J. Kame'enui and Deborah C. Simmons of the University of Oregon. The Panel Chair Summary for Nevada's third submission suggested that the State seek technical assistance on instructional assessments. The Panel Chair Summary for Nevada's fourth submission referred the State to the website at the University of Oregon, which contains a review

---

[2] This official left the Department in January of 2003 and for purposes of consistency and clarity will be referred to in this section simply as "the Assistant Secretary for OESE."

of assessments. The Department's Expert Review Team Report corresponding to each submission omitted these comments.

The author of Nevada's Reading First application, Joan Taylor, informed us that the Department's Expert Review Team Report was not specific about what the State needed to fix. She stated that the Reading First Director and his assistant worked with her through a series of conference calls to "try and figure out" what the subpanel wanted. Taylor informed us that she finally asked if there was anything more in writing and was told by the Reading First Director and his assistant that there was nothing. Taylor stated that she felt like she had to guess at what the subpanel wanted and when she did not know what else to do she asked for technical assistance. Taylor informed us that the Reading First Director and his assistant suggested that she look at the Oregon website during a phone conference. Taylor stated that she went to the Oregon website and found the Consumer's Guide.

Taylor was not aware that the document she was discussing with the Reading First Director and his assistant was in fact a Department-written summary of the subpanel's comments and told us that she would have wanted to see the actual subpanel comments. We provided her with two of the Panel Chair Summaries and asked her to compare them to the corresponding Department's Expert Review Team Reports. Taylor stated that the additional documents "would have been very helpful" and "would have saved [her] lots of time" during the application process.

### New York

New York submitted its application three times prior to receiving funding. The Department's Expert Review Team Report for New York's first submission did not include specific concerns that the subpanel had about 8 of the 25 criteria. It appears as though the State was not aware of these concerns and did not address them in its resubmission because the subpanel repeated some of these concerns during its second review. The panel chair also stated in the Panel Chair Summary that the assessment, the Woodcock Reading Mastery Test (WRMT), would be inappropriate. The Reading First Director and his assistant wrote in the Department's Expert Review Team Report that only one of WRMT's subtests would be appropriate.

### Georgia

Georgia submitted its application three times prior to receiving approval. The Department's Expert Review Team Report for Georgia's first submission failed to adequately summarize the subpanel's comments about instructional assessments and programs. The Department's Expert Review Team Report included the comment that "the review team expressed great concern that, according to the budget...purchasing materials for classroom libraries is a higher priority than purchasing and implementing core reading program materials." This comment was not in the Panel Chair Summary. The Department's Expert Review Team Report for the next submission omitted the subpanel's request for more information on how the Dynamic Indicators of Basic Early Learning Skills (DIBELS) assessment could be used for progress monitoring. Throughout the Georgia application review process, the Department's Expert Review Team Report used comments from individual panelists' Technical Review Forms that were not mentioned in the Panel Chair Summary as representing the consensus of the subpanel.

### Wisconsin
Wisconsin submitted its application four times prior to receiving approval. The Panel Chair Summaries for Wisconsin's submissions often included comments that ran several pages for each criterion. One Panel Chair Summary was 88 pages long while the Department's Expert Review Team Report was only 4 pages and failed to capture most of what was prepared by the panel chair. Further, the Department's Expert Review Team Report often did not include any of the panel chair's specific concerns and simply restated the application criteria requirements instead.

### Virginia
Virginia submitted its application three times prior to receiving approval. The Department's Expert Review Team Report for Virginia's second submission left out a comment from the Panel Chair Summary that the Partnership for Achieving Successful Schools (PASS) model was inadequately related to SBRR and simply stated that the corresponding criteria did not meet standard. In the third Panel Chair Summary, the rating for this criterion was again "does not meet standard" because this issue had not been addressed. The panel chair wrote: "PASS model requires justification…in its alignment [with] SBRR – as we requested last time." Virginia's final application includes an addendum stating that PASS schools in Virginia receiving funds through Reading First will be required to replace their existing programs with comprehensive SBRR programs.

### North Dakota
North Dakota submitted its application five times prior to receiving approval. The Department's Expert Review Team Reports for North Dakota's submissions contained generalized comments that did not relate to those in the corresponding Panel Chair Summaries. The Department's Expert Review Team Reports did not include many of the specific concerns provided in the Panel Chair Summaries.

The Department, by substituting the expert review panel's comments with a Department-created report, did not follow its own guidance for the peer review process. States were not always able to quickly or effectively address problems in their applications because they did not have the benefit of the expert review panel's comments. This increased the resources required by States to apply and by the federal government to review the applications. As a result, not only was the application review process not effectively and efficiently carried out but not all recommendations for improvement were relayed to the States.

## FINDING 2B – The Department Awarded Grants to States Without Documentation That the Subpanels Approved All Criteria

Of the 12 Reading First grant application files that we reviewed, it does not appear that the subpanels approved the final applications for four States and one territory: Connecticut, Nevada, New York, Virginia, and Puerto Rico. The Panel Chair Summaries for each final application provided an overall rating of "Disapproval." The Department has not provided any documentation indicating the subpanels approved the final applications for these five applicants.

For example, the Panel Chair Summary for New York's final application provided a rating of "Does Not Meet Standard" for three criteria. The three criteria were Instructional Assessments,

Coherence, and Process for Awarding Subgrants. In the Instructional Assessments and Coherence sections, the subpanel noted inconsistencies between the application narrative and the subgrant request for proposal rubric. In the "Process for Awarding Subgrants" section, the subpanel recommended that the New York State Education Department (NYSED) either change the minimum cut-off score from 75 to a minimum cut-off score of 80 or include a sentence addressed to NYSED's expert reviewers and LEA applicants that unless all of the bulleted points for each category were addressed, the category could not be judged to have met standard. The Department has not provided additional documentation to show that these issues were resolved prior to the Reading First grant being awarded. In fact, NYSED's application, posted as approved on its website, did not address any of the recommendations made in the Panel Chair Summary.

As a result, some applicants were funded without documentation that they met all of the criteria for approval raising a question of whether these States should have been funded.

**FINDING 3 –    The Department Included Requirements in the Criteria Used by the Expert Review Panels That Were Not Specifically Addressed in NCLB**

Our objective was to determine if the expert review panel reviewed the applications in accordance with established criteria and applied the criteria consistently. The Department instructed the panelists to use the *Reading First: Criteria for Review of State Applications* (Reading First Criteria) when rating the 25 criteria in each State application. Each criterion was broken up into requirements for a rating of 'Exemplary,' 'Meets Standard,' and 'Does Not Meet Standard.' The Reading First Criteria states "the 'Meets Standard' column describes the conditions that reviewers will expect all State applications to meet," while the "'Exemplary' column describes conditions that, when met in addition to those listed under 'Meets Standard,' would be expected to result in the highest quality Reading First programs."

Additionally, the Reviewer Guidance states: "The purpose of the review criteria is to ensure that all applications meet the required standards. Panelists are to use only these criteria in evaluating applications." The Technical Review forms and Panel Chair Summary forms, which the expert review panelists used when reviewing State applications, included the same 'Meets Standard' conditions as the Reading First Criteria.

Based on our review of 12 State applications, it appears the expert review panelists reviewed the applications in accordance with the criteria provided to them and applied the criteria consistently. The criteria, however, included conditions that were not specifically required in the statute. For example, the 'Meets Standard' column of criterion IV(A), Key Reading First Classroom Characteristics, required State applications to meet three conditions that were not included in the statute:

- Condition 1b required, "Coherent instructional design that includes explicit instructional strategies, coordinated instructional sequences, ample practice opportunities, and aligned student materials[.]"

- Condition 1d required, "Protected, dedicated block of time for reading instruction[.]"

- Condition 1f required, "Small group instruction as appropriate to meet student needs, with placement and movement based on ongoing assessment[.]"

In a document titled, "Pre-reading notes for [the Assistant Secretary for OESE]" (Pre-reading notes document), the Reading First Director commented on a draft of the Reading First Criteria. The Reading First Director wrote that the Key Reading First Classroom Characteristics section of the Reading First Criteria was significant because "[i]t's another example of our aggressive approach because, obviously, very little of this section can be pegged to legislative language. It just makes good sense, of course, to help the States see what we know/want RF [Reading First] classrooms to look like. OGC may not like this entire section, and I wanted to birddog it for you." He continued:

> We realize the Meets Standards column is much more fleshed-out than the Exemplary column....What we've done – again, extra-legally, really – is push all the characteristics that we originally had in Exemplary and moved them into Meets, because we want all of those (a, b, …g) characteristics to define *ALL* RF classrooms, not just the star RF classrooms.

The 'Exemplary' column in the final Key Reading First Classroom Characteristics section only includes one condition in addition to the requirement that the section 'Meets Standard.' In an interview, the Reading First Director acknowledged that the Department included conditions in the 'Meets Standard' column of the Reading First Criteria that were not in the law.

Because the Department included language in the 'Meets Standard' column of its Reading First Criteria that was not based on the statute, State applications were reviewed based upon standards that were not required by the statute.

**FINDING 4 –    In Implementing the Reading First Program, Department Officials Obscured the Statutory Requirements of the ESEA; Acted in Contravention of the GAO *Standards for Internal Control in the Federal Government*; and Took Actions That Call Into Question Whether They Violated the Prohibitions Included in the DEOA**

In the course of answering our objectives for the inspection, we found that the Department, acting through the former Assistant Secretary for OESE, the Reading First Director, and others:

- Developed an application package that obscured the requirements of the statute;
- Took action with respect to the expert review panel process that was contrary to the balanced panel composition envisioned by Congress;
- Intervened to release an assessment review document without the permission of the entity that contracted for its development;
- Intervened to influence a State's selection of reading programs; and

- Intervened to influence reading programs being used by LEAs after the application process was completed.

These actions demonstrate that the program officials failed to maintain a control environment that exemplifies management integrity and accountability.

Congress was explicit about what it intended this program to achieve, how it was to be implemented, and what was to be funded. Congress provided specific legislative guidance on the application approval process, the composition of peer review panels (Title 1, Part B, Section 1203), and the respective roles of the SEAs, LEAs, and the Department (Title 1, Part B, Section 1202). Congress also spelled out an information dissemination role for NIFL. Title 1, Part B, Section 1207(a)(1) directs NIFL to "disseminate information on scientifically based reading research. . . ." As discussed below, program officials tried to purposely obscure the content of the statute and otherwise took actions that seemed to disregard Congress' direction and intent.

The *Standards for Internal Control in the Federal Government* were issued by GAO in 1999.[3] In the standards, GAO defines internal control as "[a]n integral component of an organization's management that provides reasonable assurance that the following objectives are being achieved: effectiveness and efficiency of operations, reliability of financial reporting, and compliance with applicable laws and regulations." As noted in the Foreword to the standards, appropriate internal controls is a key factor in improving accountability. In the standards, GAO states: "Management and employees should establish and maintain an environment throughout the organization that sets a positive and supportive attitude toward internal control and conscientious management." The first element identified in the standards as affecting the control environment is "the integrity and ethical values maintained and demonstrated by management and staff."

Further, the Department issued an Administrative Communications System (ACS) Directive entitled "Federal Managers' Financial Integrity Act Management/Reporting on Internal Controls" in 2003. The provisions of the directive apply to all of the Department's program and administrative activities, and to all managers at all organizations levels. The directive states that one of the objectives of internal control is so that "Programs and operations are executed and resources are used consistently with agency mission and in compliance with applicable provisions of law, regulation, and government-wide policy requirements." The directive also states that a major step in the internal control process is establishing management controls, including establishing and maintaining a control environment throughout the organization that sets a positive and supportive attitude toward internal control and conscientious management. A guiding factor of that control environment is that "management provides leadership to ensure integrity and ethical values are maintained and demonstrated by management and staff." As discussed below, the actions of the program officials demonstrated a lack of integrity and ethical values that created a control environment that allowed non-compliance with laws and regulations.

---

[3] The Federal Managers' Financial Integrity Act of 1982 (FMFIA) requires GAO to issue standards for internal control in government. The Office of Management and Budget (OMB) Circular A-123, Management Accountability and Control, revised June 21, 1995, provides the specific requirements for assessing and reporting on controls. OMB Circular A-123 was revised on December 21, 2004 and became effective beginning with fiscal year 2006.

Finally, the DEOA, which established the Department in October 1979, describes the Federal-State relationship in education as follows:

> §3403(b) No provision of a program administered by the Secretary or by any other officer of the Department shall be construed to authorize the Secretary or any such officer to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system...over the selection or content of...textbooks, or other instructional materials by any educational institution or school system, except to the extent authorized by law.

Section 9527 of the ESEA includes a specific prohibition on endorsement of curriculum, which reinforces the language in §3403(b): "Notwithstanding any other prohibition of Federal law, no funds provided to the Department under this Act may be used by the Department to endorse, approve, or sanction any curriculum..." As discussed below, the Department Officials' actions raise questions about whether they performed their duties to avoid these prohibitions.

**The Department Developed an Application Package That Obscured the Requirements of the Statute**

In January 2002, the then Assistant Secretary for OESE[4] worked closely with the Reading First Director in developing the application package to be provided to States. The package consisted of the application, the Reading First Criteria, which outlined the requirements each State application needed to meet to receive funding, and the Reading First Guidance.

The Assistant Secretary for OESE planned for the Reading First Guidance to include language that was not in the statute and exclude language that was in the statute. After reviewing a revision to the Department's draft of the Reading First Guidance, the Assistant Secretary for OESE wrote to the Reading First Director, "under reading first plan. i'd like not to say 'this must include early intervention and reading remediation materials' which i think could be read as 'reading recovery' [a reading program]. even if it says this in the law, i'd like it taken out." The subject phrase appears in the law twice.[5]

The Assistant Secretary for OESE later wrote, "i think we've lost our voice in this guidance, and returned to a business as usual, bureaucratic don't say what we really want kind of voice."

---

[4] This official left the Department in January of 2003 and for purposes of consistency and clarity will be referred to in this section simply as "the Assistant Secretary for OESE."

[5] Section 1202(d)(3)(A)(ii)(I) of the ESEA provides States with the option to use a percentage of grant funds to develop and implement a program of professional development for teachers that shall include "information on instructional materials, programs, strategies, and approaches based on scientifically based reading research, *including early intervention and reading remediation materials*, programs, and approaches. . . ." (Emphasis added.)

Section 1203(b)(4)(B) of the ESEA states that State applications are required to include a description of how "the State educational agency will assist local educational agencies in identifying instructional materials, programs, strategies, and approaches, based on scientifically based reading research, *including early intervention and reading remediation materials*, programs, and approaches." (Emphasis added.)

The Reading First Director noted that the Guidance was as bold as it could be, given the law. He wrote:

> The guidance – throughout – was written in a way that ED people, and then I, thought was the strongest we were able to make it, *given the law.*...I do not want to seem insufficiently bold, but on many of the areas where you clearly want more boldness and different-ness, the summary of my on-going poll of ED insiders is "The law won't let you do that, no matter what [the Assistant Secretary for OESE] wants/says."

The Reading First Director also acknowledged that he expected State officials to review the Guidance closely to see that it was in accord with the statute. He added:

> [I]t has been suggested to me that the Guidance may be the most problematic place to put some of your suggestions for increased boldness. Why? Guidance is the official place where the State people with the closest readings of the law will go to see where ED has overstepped what the law lets them say. In remarks to groups...or face-to-face meetings about what the Review Panel will/won't accept the opportunities for BOLDNESS and, perhaps, extralegal requirements are many.

The approach outlined by the Reading First Director was eventually reflected in the application package that was available to every State on April 2, 2002. As discussed in Finding 3, the Department ultimately included the "bold" language that distorted the requirements of the statute in the Reading First Criteria.

In the Pre-reading notes document, the Reading First Director wrote:

> OGC could likely have concerns with the overall, near-unrelenting **aggressiveness** of this application...the law does not really require what **we** are quite literally requiring in our (aggressive) application. Such examples are manifold and OGC may catch some, many or all of them. We have not highlighted them to OGC, of course, and we don't know how many they'll focus on. On some issues, we may be able to dodge a little by moving some 'Meets Standards' points to the 'Exemplary,' but if we do that too much, the result is a less bold application and decreased chances of overall success. We'll need your muscle with OGC on these points across the board.

Ultimately, the Department determined that the Reading First Guidance would be used as a means of appearing to comply with the requirements of the statute. In the Pre-reading notes document, the Reading First Director wrote:

> [T]here are things in the Guidance that are **not** in the application – for strategic reasons – because we did not want to remind all applicants of their existence so prominently...but we felt we had to compromise, i.e. put in the Guidance, in some places where the law makes certain things un-ignorable.

The Reading First Director illustrated this strategy by providing the following examples in the Pre-reading notes document:

> Page 19, [Section] F-2, 2 b. [of the Guidance] **"Providing expanded opportunities** to students in kindergarten through grade 3 who are served by eligible local educational agencies for receiving reading assistance from alternative providers."

> We make absolutely no mention on this opportunity in the application, because we don't like it and don't want to open the door to this, but it is in the law and needs to be addressed somewhere reasonably official – like the Guidance – as a "best" compromise. FYI.

> Also, Page 19, [Section] F-3 **Are there any required priorities for funds reserved for State use?** Yes. A State educational agency shall give priority to carrying out the activities described in Question F-2 for schools that are among the schools served by eligible local educational agencies with the highest percentages…"

> Again, my belief is that this is a potential back door though [sic] which some money could flow in unwanted directions, and therefore this **required priorities for funds reserved for State use** element of the law is NOT NOT [sic] in the application, but we have to reflect that we know it exists *somewhere*, so that place is the Guidance. FYI.

In the final Reading First Guidance, Section F-2, 2b. remained unchanged from the portion quoted above. In section F-3, the substantive content from the portion quoted above remained unchanged.

**The Department Took Action With Respect to the Expert Review Panel Process That Was Contrary to the Balanced Panel Composition Envisioned by Congress**
Congress, through Title 1, Part B, Section 1203(c)(2)(A) of the ESEA, envisioned an expert review panel with equal representation from the Department, NIFL, NAS, and NICHD. As we reported in Finding 1A, the Department nominated a majority of the individuals serving on the expert review panel. Additionally, 15 of the 16 subpanels had a majority of Department-nominated panelists and none had the balanced composition envisioned by Congress.

The Reading First Director took direct action to ensure that a particular approach to reading instruction was represented on the expert review panel. Direct Instruction (DI) is a model for teaching that requires the use of Reading Mastery, a program published by SRA/McGraw-Hill, to teach reading. The Reading First Director formerly served as the Executive Director of the Baltimore Curriculum Project, which has implemented DI in Baltimore City schools since 1996.

The Reading First Director personally nominated three individuals who had significant professional connections to DI to serve on the expert review panel. The Reading First Director

selected these three individuals to serve on a total of seven of the 16 subpanels and one of these individuals to serve as the panel chair on five subpanels. These three individuals were collectively involved in reviewing a total of 23 States' applications.

A Baltimore City Public Schools official contacted a Department official to express concern that two panelists were involved with or employed by DI and questioned whether those two panelists indicated their connections to DI on the conflict of interest form. In May 2002, the Department official forwarded this information to the Reading First Director who passed the concerns on to one of the panelists in question as a "Confidential FYI." This panelist replied:

> I suspect that [the Baltimore City Public Schools official's] assumption is that USDE must be warned that there may be DI infiltrators and that somehow USDE knows how dangerous that can be. You may remember that [the Baltimore City Public Schools official] is a whole language (now called Balanced Literacy) proponent.

The subsequent e-mail response from the Reading First Director suggests his intention to ensure a DI presence on the expert review panel: "Funny that [the Baltimore City Public Schools official] calls *me* to inform that there may be some pro-DI folks on *my* panel!!! Too rich!" The panelist then asked, "Does he know who you are? Past and present?" The Reading First Director replied, "That's the funniest part – yes! You know the line from Casablanca, 'I am SHOCKED that there is gambling going on in this establishment!' Well, 'I am SHOCKED that there are pro-DI people on this panel!'"

Shortly before this exchange, a Department employee reported to the Reading First Director that the Department had received a question from a member of the media about the panel composition. The response by the Reading First Director suggests that he may indeed have intended to "stack" the expert review panel. The employee stated: "The question is…are we going to 'stack the panel' so programs like Reading Recovery don't get a fair shake[?]" The Reading First Director responded, "'Stack the panel?'…I have never *heard* of such a thing….<harumph, harumph>[.]"

A few days before the Department publicly announced the panelists it had chosen to serve, one of the Department-nominated panelists contacted the Reading First Director and shared his strong bias against Reading Recovery and his strategy for responding to any State that planned to include Reading Recovery in its application. The Reading First Director responded: "I really like the way you're viewing/approaching this, and not just because it matches my own approach :-), I swear!" This individual later served as the panel chair for the subpanel that reviewed Wisconsin's State application and in response to the State's plans to use Reading Recovery, he included an 11-page negative review of Reading Recovery in his official comments on the application.

Around the same time, Reid Lyon, the former Chief of the Child Development & Behavior Branch at the NICHD, advised the Reading First Director, the Assistant Secretary for OESE, and the Senior Advisor to the Secretary at the time that one of the panelists had been "actively working to undermine the NRP [National Reading Panel] Report and the RF initiatives." Lyon

further stated, "Chances are that other reviewers can trump any bias on her part." In a written response to all of the people involved, the former Senior Advisor to the Secretary stated, "We can't un-invite her. Just make sure she is on a panel with one of our barracuda types."

The statute envisioned that the expert review panel would be balanced with representatives from the Department and three other named organizations. In fact, virtually all of the subpanels had a majority of Department-nominated panelists. Against this backdrop, the actions of the Director and the former Senior Advisor to the Secretary become particularly problematic.

Additionally, the first element identified in GAO's *Standards for Internal Control in the Federal Government* as affecting the control environment is "the integrity and ethical values maintained and demonstrated by management and staff." The apparent intent of the Reading First Director to include and to give a significant role to panelists who reflected his personal preference in reading programs; his specific encouragement to a panelist who held views similar to his on Reading Recovery; and the intention of the former Senior Advisor to the Secretary to control another panelist raise significant questions about the control environment in which the program was being managed.

**The Department Intervened to Release an Assessment Review Document Without the Permission of the Entity That Contracted for Its Development**
Title 1, Part B, Section 1207(a)(1) of the ESEA directs NIFL to "disseminate information on scientifically based reading research. . . ." NIFL contracted for the University of Oregon's Institute for the Development of Educational Achievement (IDEA) to perform a review of assessments. The Reading First Director inappropriately intervened to release the report produced as a result of this review.

In January and February of 2002, the Department held "The Secretary's Reading Leadership Academies" (SRLAs). *The Reading Leadership Academy Guidebook* (the Guidebook) was published after the SRLAs and collected "the essential materials offered to more than 600 state-level administrators and policy makers at the academies."

The Guidebook included a PowerPoint presentation on "the dimensions of assessment important to reading instruction" by a group referred to as the "Reading First Academy Assessment Committee." This committee consisted of eight members, led by Edward Kame'enui, the Director of IDEA. In the presentation, this committee listed a sample of assessments that it planned to review.

The committee's final report, "An Analysis of Reading Assessment Instruments for K-3," does not mention any connection to the Department or to NIFL. Additionally, the committee does not refer to itself as the "Reading First Academy Assessment Committee," but rather only as the "Assessment Committee."

The report includes an analysis of 29 assessments. Of these 29, the Assessment Committee found 24 to have "'sufficient evidence' for use as screening, diagnosis, progress monitoring, and/or outcome instruments to assess one or more essential reading components at one or more

grade levels K-3." The Assessment Committee found the other five assessments "not to have 'sufficient evidence'. . . ."

The report, which can be found on the IDEA website, states: "there are literally hundreds of reading assessment instruments available in the marketplace." The report states that the Assessment Committee, as a starting point, used the Southwest Educational Development Laboratory's (SEDL) "Reading Assessment Database for Grades K-2: Statewide Assessments" to help select the assessments it would review. According to the report, this database yielded 154 possible early reading assessment tools. In addition, the Assessment Committee members submitted 27 personal recommendations of reading assessment measures.

Of the 29 assessments the Assessment Committee selected to review, 11 were chosen solely from the SEDL database and the remaining 18 were on the list of personal recommendations.

Of the 24 assessments the Assessment Committee found to have "sufficient evidence," seven were directly tied to Assessment Committee members:

- Five were developed or co-developed by Assessment Committee members;
- One lists an Assessment Committee member as the individual who can provide technical information; and
- One is the product of a company that is directed by an Assessment Committee member.

Although NIFL funded the Assessment Committee's review, the Director of NIFL, Sandra Baxter, informed us that she decided not to issue the Assessment Committee's final report. NIFL officials were concerned that releasing the report might appear as though NIFL was endorsing specific products. Baxter sought guidance on the endorsement issue from the Department's OGC on whether NIFL should release the report. It is unclear if this guidance was ever provided to NIFL.

When we notified Baxter and Lynn Reddy, the Deputy Director of NIFL, that the report was released on the IDEA website, Baxter informed us that she was surprised to learn this. Reddy expressed the view that the Assessment Committee's report should not have been posted on the IDEA website.

The Reading First Director was in frequent contact with Kame'enui and Doug Carnine, a research associate at IDEA and professor at the University of Oregon, concerning the release of the Assessment Committee's report. In e-mail correspondence with Carnine in May 2002, Kame'enui wrote, "If I am asked, who do I say initiated and funded this effort?" Carnine responded, "Say you received funding from RMC [RMC Research Corporation, a Reading First contractor]. If they ask who funded RMC say the Dept of Ed. You should not need to answer such questions in writing."

Carnine forwarded this string of e-mails to the Reading First Director and wrote, "Should [Kame'enui's] report go to RMC? Should it be on the web before being sent to you?" The Reading First Director responded, "As I/we try to weigh all the elements and make the best

decision, I'd like to know whether the Assessment work is ready to go fully live…?" Carnine responded, "They are ready to go live but I see now that [the Assistant Secretary for OESE] wants to review." In a later e-mail, Carnine asked, "Is [the Assistant Secretary for OESE] thinking of killing [the report]?" The Reading First Director responded, "I don't *think* so, and I am arguing strenuously against that. Very strenuously."

The Reading First Director sent Kame'enui an e-mail requesting that he send the Assessment Committee's report to the Assistant Secretary for OESE "prior to the 'release' to the public." Kame'enui asked the Reading First Director whether he should send a set of report materials for him too. The Reading First Director responded, "Yes, please! Then I can become a better-informed ambassador and advocate for the Assessment Committee's work!"

While waiting for the approval to release the Assessment Committee report, Kame'enui consulted with the Reading First Director over what to tell publishers that asked about it. Kame'enui asked, "should I say the report is completed but under review or do I simply say it is not ready for public release?" The Reading First Director advised Kame'enui to "go with…'not ready' for the reason that the 'under review' option could lead to the non-trivial question, 'Under review by whom?' which then gets into the next issue of, 'is this a NIFL doc, or an ED doc?'"

Kame'enui, in correspondence with the Assessment Committee members and the Reading First Director shortly before the release of the report, wrote: "[T]he report will be presented and represented publicly as an independent report completed under the auspices of our institute, the Institute for the Development of Educational Achievement (IDEA) in the College of Education at the University of Oregon. It will not be identified as a Reading First document." Kame'enui also made the decision to present the report itself as a "singular effort" on his part, rather than as the effort of the Assessment Committee. One reason he provided was: "Because several of [the Assessment Committee members] are authors or co-authors of the assessment instruments [the Assessment Committee] reviewed, the perception of a conflict of interest in shaping the final report was a concern."

In May 2002, the Reading First Director asked the Assistant Secretary for OESE if he could give Kame'enui permission to put the report on the IDEA website and stated, "[NIFL] will slow us down." The Assistant Secretary for OESE informed the Reading First Director that Kame'enui had not yet shared the report with NIFL.

A few days later, the Reading First Director asked the Assistant Secretary for OESE if he had "permission to bug Sandra Baxter about the…assessment work," writing that "[s]tates are desperate for that critical work." In response, the Assistant Secretary for OESE informed the Reading First Director that the report could be put on the IDEA website and then the report would go on The Partnership for Reading[6] (Partnership) website after Baxter approved it.

Later that day, the Reading First Director wrote to Kame'enui:

---

[6] The Partnership for Reading is administered by NIFL and, according to its website, is "a collaborative effort by three federal agencies - the National Institute for Literacy (NIFL), the National Institute of Child Health and Human Development (NICHD), and the U.S. Department of Education - to bring the findings of evidence-based reading research to the educational community, families, and others with an interest in helping all people learn to read well."

> Please post your splendid work on your IDEA website, announce it in any way(s)
> you choose, and I will inform you when we can post it as well on the Partnership
> website, NIFL, maybe even ED's…I will worry about the Baxter/NIFL angle –
> you are completely covered, [The Assistant Secretary for OESE] has approved
> this specific step.  No worries on your end.

One day later, Baxter wrote in an e-mail to the Reading First Director: "The copy of the final
report just reached us today…I'll let you know…what our timeline for releasing the results will
be."  A few days later, Baxter wrote to the Reading First Director: "Clearly, [the Assessment
Committee's final report] is not in shape for publication as submitted.  I'll need at least a few
days to read the entire report and determine just how to streamline it into a document that is
useful to our intended audience."  The Reading First Director forwarded this e-mail to the
Assistant Secretary for OESE, who responded, "at this rate, it may never get up on the nifl
website."

The Assessment Committee's final report never appeared on NIFL's or the Partnership's
website.

**The Department Intervened to Influence a State's Selection of Reading Programs**
As noted above, the Department is prohibited from endorsing curriculum and from mandating,
directing or controlling a State's curriculum or program of instruction.

In July 2003, the Reading First Director received information from the Maryland State
Department of Education's (MSDE) Director of Reading First concerning a clarification to the
State's plans for selecting a list of core reading programs.  The Reading First Director then
forwarded this information to Carnine and Jerry Silbert, a consultant to RMC, and stated:

> This CONFIDENTIAL update comes after a direct call I made to MD [Maryland]
> after a tip/suggestion from [Silbert].  This "clarification" represents a marked shift
> from their earlier comments and, although not settled completely yet, bodes well
> for DI in Baltimore.  Who knows [Michael] Coyne [an Assistant Professor at the
> University of Connecticut] well?  We need to ENSURE that when MD *does* do
> its application of…Consumer Guide that Reading Mastery [a DI reading program
> published by SRA/McGraw-Hill] is NOT relegated to supplemental status, which
> would be HORRIBLE for so many…schools in Balt[imore].

On August 1, 2003, Carnine sent Kame'enui an e-mail and asked him to forward it to Michael
Coyne.  In this e-mail, Carnine stated:

> Just mention that [Baltimore] has many schools using RM [Reading Mastery] as a
> core program with EXCELLENT results but that MSDE, for all the wrong
> reasons, left to its own devices could well shunt RM off to the side with the kiss-
> of-death as a "supplemental" or "intervention" program.  And, once MSDE did
> something like that, it would be much harder to have them un-do it. . . .The way

> it's set up, if, while applying [the Consumer's Guide] tool, [MSDE] were to
> classify RM as a comprehensive program…MSDE couldn't un-do it.

After obtaining Coyne's e-mail address, Carnine stated to Coyne in an e-mail, dated August 2,
2003:

> Please let me know if you have questions. Also feel free to ask [the Reading First
> Director] to confirm that RM can legitimately be treated as a core program…For
> more on DI results (as a core program) in MD you can contact Muriel Berkeley
> [the President and CEO of the Baltimore Curriculum Project who also served as
> an expert review panelist]. . . .

Carnine ensured that the Reading First Director and Berkeley were fully informed of his actions
by forwarding both of the August 2003 e-mails to them.

In November 2003, MSDE issued the "Final Report of the Maryland Committee for Selecting
Core Reading Programs." The report stated that all LEA representatives on the committee "were
required to participate in a full day of training by Dr. Michael Coyne on September 16, 2003."

The report then stated:

> Also during August [2003], Dr. Deborah C. Simmons [the former Associate
> Director of IDEA at the University of Oregon] and her associate, Dr. Michael
> Coyne, were in frequent communication with [MSDE's] Office of Reading First
> to plan how to use the *Consumer's Guide for Evaluating a Core Reading
> Program* (Simmons & Kame'enui, 2003) in order to achieve the goal of
> establishing a Fall 2003 list of Maryland Approved Core Reading Programs.

> Dr. Simmons advised that Maryland base the work of its statewide Committee on
> the *Oregon Reading First Center: Review of Comprehensive Programs*
> (Curriculum Review Panel, July 2003). Oregon's distinguished panel of
> reviewers…evaluated nine core reading programs. . . .

> …From the list of nine programs reviewed by Oregon, MSDE, responding to the
> consultant guidance of Drs. Simmons and Coyne, selected the following seven
> core programs receiving the highest Oregon ratings for the Maryland Committee's
> work:

> - Houghton Mifflin, *The Nation's Choice 2003*
> - SRA, *Open Court 2002*
> - SRA/McGraw-Hill, *Reading Mastery Plus 2002*
> - Macmillan/McGraw-Hill, *Macmillan/McGraw-Hill Reading 2003*
> - Harcourt, *Trophies 2003*
> - Success for All Foundation, *Success for All*
> - Scott Foresman, *Scott Foresman Reading 2004*[.]

The report stated, "Maryland's approved application for funding under Reading First specifies that every Reading First School, kindergarten through third grade, must implement a core reading program from this list that is based on scientifically based reading research (SBRR)."

As a result of the actions taken with regard to MSDE's process for selecting core reading programs, the Reading First Director's initial fear that Reading Mastery would be "relegated to supplemental status" was not realized since MSDE, with the help of Simmons and Coyne, selected Reading Mastery as one of its seven core reading programs. The Reading First Director's actions raise a question as to whether he was acting with the restraint envisioned by Congress in the endorsement of curriculum prohibitions of the DEOA and the ESEA.

**The Department Intervened to Influence Reading Programs Being Used by LEAs After the Application Process Was Completed**
After certain States completed the application process and received funding, the Reading First Director became aware that certain LEAs in these States were using the Rigby Literacy (Rigby) and Wright Group Literacy (Wright Group) programs. The Reading First Director worked closely with a Department staff member, a former expert review panelist, who undertook a review of both of these programs.

In e-mail correspondence with the staff member regarding the Wright Group, the Reading First Director stated:

> Beat the [expletive deleted] out of them in a way that will stand up to any level of legal and [whole language] apologist scrutiny. Hit them over and over with definitive evidence that they are not SBRR, never have been and never will be. They are trying to crash our party and we need to beat the [expletive deleted] out of them in front of all the other would-be party crashers who are standing on the front lawn waiting to see how we welcome these dirtbags.

The Reading First Director forwarded the above e-mail to Lyon and stated:

> Confidential FYI. Pardon in-house language I use…with fellow team members and friends. Do you know—on the QT—if anyone has done any good review of the Wright Group stuff, to date? We have beaten Maine on Rigby and this is cut from the same cloth. We are proceeding, of course, but if you knew of a good piece of work dissecting The Wright Group's stuff, it could further strengthen our hand.

Lyon responded that he would obtain this information and added, "I like your style." In response, the Reading First Director stated, "Additional firepower…may help us make this a one-punch fight."

After reviewing the programs, the staff member provided the Reading First Director with notes and talking points critiquing these programs. The Reading First Director used this information to convince States using Rigby and Wright Group to change programs. In an e-mail to Lyon, the Reading First Director wrote, "I spoke to Fred Carrigg [the former New Jersey Director of

Reading First]…with a roomful of others on their end and they are HALTING the funding of Rigby and, while we were at it, Wright Group. They STOPPED the districts who wanted to use those programs."

In a later e-mail to Lyon, the Reading First Director stated:

> As you may remember, RF got Maine to UNDO its already-made decision to have Rigby be one of their two approved core programs (Ha, ha – Rigby as a CORE program? When pigs fly!) We also as you may recall, got NJ [New Jersey] to stop its districts from using Rigby (and the Wright Group, btw) and are doing the same in Mississippi. This is for your FYI, as I think this program-bashing is best done off or under the major radar screens.

In a formal letter to Carrigg, the Reading First Director did not specifically name Rigby and Wright Group as not being aligned with SBRR. The Reading First Director wrote, "It appeared that New Jersey had not fulfilled its responsibility to ensure that all LEAs and schools selected to participate in Reading First…would implement comprehensive reading programs that are fully aligned with scientifically based reading research." The Reading First Director informed us that he could not definitively say why he did not formally state in the letter that those specific programs were not in line with SBRR.

Massachusetts, North Dakota, and Kentucky also encountered post-application problems concerning the implementation of their reading programs. Massachusetts was approved in its Reading First application to develop its own guide for LEAs to select reading programs. North Dakota was approved in its Reading First application to develop a State list of approved programs using the Consumer's Guide. Kentucky was approved in its Reading First application to adopt the Massachusetts guide. LEAs in all three of these States selected reading programs that were later questioned by the Reading First Director or his assistant.

***Massachusetts***
In Massachusetts, the Reading First Director raised questions over the SBRR qualifications of programs in four districts. The Coordinator of the Massachusetts Reading First Program, Cheryl Liebling, who had worked for RMC as a consultant during the application process, informed us that the Reading First Director contacted her with concern over the programs currently in use in these districts. This concern was raised even though the State had approved the LEAs' choices for reading programs using the expert review panel-approved criteria. The programs used by the four districts were Wright Group, Rigby, Literacy Collaborative, and Harcourt Collections. Liebling said that she contacted the districts and suggested a change, telling the districts that the Reading First Director had concerns about their programs. The district using Wright Group elected not to change its program, even after Liebling's recommendation. This district eventually had its funding taken away. The three other districts agreed to change to other programs and all three districts continue to be funded.

***North Dakota***
During North Dakota's first year of LEA grants, three schools used the State list of approved programs to select Rigby as their reading program. After the State approved their use of Rigby,

the three schools implemented the program. The North Dakota Reading First Assistant Director, Gail Schauer, in an e-mail to the Reading First Director, wrote, "[The Reading First Director's assistant] indicated that North Dakota Reading First could not use the Rigby Literacy Program as a core reading program. The Rigby Literacy Program, however, could be used as a supplemental program." Schauer requested that the three schools "be allowed to implement the Rigby Literacy Program in their Reading First schools until their three-year subgrant period is completed…based on the fact that the Rigby Literacy Program was an approved program at the time they wrote their grant, received approval, and began the implementation phase." Schauer contacted the Reading First Director's assistant two months later to ask whether any decisions were made on the schools' use of Rigby. The Reading First Director's assistant responded that the Department was waiting for feedback on the State's monitoring visit to make a final determination.

A month and a half later, Schauer contacted the Reading First Director's assistant again asking for information on Rigby. The Reading First Director's assistant replied that the Department did not have the full findings from the monitoring report, but the preliminary report "found that the core program used in the Fargo School District did not appear to be systematic, explicit or sequential" and the report found "instruction in classrooms to focus on strategies such as cueing systems, which are not aligned with scientifically based reading research." Schauer informed us that given a choice between receiving Reading First funds or continuing their use of Rigby, the three schools opted to stay with Rigby. All three lost their funding after the first year of implementation.

### Kentucky

The Reading First Director questioned the use of Reading Recovery and Rigby in three Kentucky districts. The Reading First Director informed us that he asked the State to provide more justification of both programs' alignment with SBRR. State officials informed us that they spoke with the Reading First Director in a conference call and informed him that they believed Reading Recovery and Rigby were sufficiently SBRR. State officials said that the Reading First Director told them he had concerns about Reading Recovery and urged them not to use Reading First funds on the program. The State officials said that they asked for this request in writing, but the Reading First Director told them that he would not do so and invited them to defend the two programs instead. The State officials subsequently provided support for the programs in writing, but they informed us that they did not receive a response from the Department. A State official informed us that the districts in question are still using Rigby and Reading Recovery. Despite the Reading First Director's assertion that these programs were not SBRR, when the State provided documentation to support the use of the programs, the Department did not respond.

The actions taken by the Reading First Director again call into question whether his intervention in these circumstances violated provisions of the DEOA and NCLB that prohibit the Department from exercising control over the curriculum or program of instruction of any school system.

Final Report
ED-OIG/I13-F0017                                                                    Page 27

# RECOMMENDATIONS

We recommend that the Assistant Secretary for OESE

1) Develop internal management policies and procedures for OESE program offices that address when legal advice will be solicited from OGC and how discussions between OGC and the program staff will be resolved to ensure that programs are managed in compliance with applicable laws and regulations.

2) In consultation with OGC, evaluate OESE's processes for assessing potential conflict of interest questions, when a panel review process is used, and make those improvements necessary to strengthen the processes.

3) Review all Reading First applications to determine whether all criteria for funding have been met.

4) Review the management and staff structure of the Reading First program office and make changes, as appropriate, to ensure that the program is managed and implemented consistent with the statutory requirements of NCLB.

5) Request that OGC develop guidance for OESE on the prohibitions imposed by §3403(b) of the Department of Education Organization Act.

6) When similar new initiatives are approved by Congress, rely upon an internal advisory committee, which includes representatives from other OESE programs, OGC, and the Department's Risk Management Team, to provide feedback on program implementation issues and ensure coordination in the delivery of similar or complimentary Department programs.

7) Rely upon the internal advisory committee to:

   a. Determine whether the implementation of Reading First harmed the Federal interest and what course of action is required to resolve any issues identified; and

   b. Ensure that future programs, including other programs for which the Department is considering using Reading First as a model, have internal controls in place to prevent similar problems from occurring.

8) Convene a discussion with a broad range of state and local education representatives to discuss issues with Reading First as part of the reauthorization process.

# DEPARTMENT COMMENTS

On August 29, 2006 we received a letter from the Secretary of Education that stated the Department concurred with all of our recommendations and that her letter would be followed by a more detailed response. On September 19, 2006 we received a second letter from the Secretary that reiterated the Department's concurrence with all the recommendations in the draft and outlined a series of steps that the Secretary would take in response to our report. The letter also stated that while the Department found the draft recommendations and much of the discussion in the report to be helpful, it did not agree with all of the key points made in the draft findings. An attached letter from the Assistant Secretary for OESE provided a detailed response to our draft. We have summarized the Department's comments and provided our responses below. All of the Department's response letters, in their entirety, are attached.

### FINDING 1A –    The Department Did Not Select the Expert Review Panel in Compliance With the Requirements of NCLB

**Department Comments**

The Department agreed with our finding that it did not fully adhere to the statutory requirement for establishing the expert review panel. The Department acknowledged that it had considered and OGC had recommended the establishment of a twelve-member "Advisory and Oversight Panel" made up of individuals nominated by NAS, NICHD, and NIFL. The Department stated that it is not aware of any information to show that not establishing this panel resulted in any inappropriate effects or disadvantage to any State, but stated that it will discuss this issue with State representatives and review applications to determine if there were any inappropriate effects.

**OIG Response**

No changes have been made to this finding. The Department acknowledged that it did not establish an expert review panel in a manner that was consistent with the statutory language.

### FINDING 1B –    While Not Required to Screen for Conflicts of Interest, the Screening Process the Department Created Was Not Effective

**Department Comments**

The Department stated that it had some concerns with this finding. The Department stated that it was not required to screen for conflicts of interest, but decided to take the extra step and establish a screening process in cooperation with the Ethics Division of OGC. The Department stated that the integrity of the panel process was important, and it took appropriate action to ensure that no conflict occurred.

The Department stated that it reasonably adapted the competitive grant conflict of interest procedures to the Reading First program. The Department stated there was no available information to show that the inclusion of six panelists who had connections to a teaching methodology resulted in any problematic behavior or that any of these panelists reviewed a state application that included such a program. The Department stated that it used the standard of "avoiding financial connections" to programs or products and that OIG suggests that the appropriate standard should have been "significant professional connections to a teaching methodology that requires the use of a specific reading program," which it labeled as not easy to define and implement.

The Department stated that the OIG finding suggests that the Department could have been better off by just meeting the minimal requirement of the law, which is that no conflict of interest screening process is required, and none needed to be implemented.

**OIG Response**
No changes have been made to this finding.

As we stated in our report, the Department was not required to screen for conflicts of interest. However, since it wisely chose to do so, we evaluated the effectiveness of the process it selected. Our objective was not to discourage the Department from taking such actions, but rather to point out simple additional actions that might have improved the process, such as including relevant questions regarding impartiality and reviewing resumes.

The six panelists mentioned had significant professional connections to Direct Instruction (DI), a model for teaching that requires the use of the program Reading Mastery. At the time of the screening process, the Department anticipated that States would include specific programs in their applications. Based upon the screening process used, the Department would not have known of the potential conflict posed by having any of the six individuals review a State application that included Direct Instruction.

**FINDING 2A –   The Department Replaced What the Law Intended to be a Peer Review Process With its Own Process**

**Department Comments**
The Department stated that it did not replace the process required by the statute, and that the statute does not establish the role of reviewers' comments. The Department stated that although the program office originally intended in its Reviewer Guidance to have reviewers provide comments directly to the applicants, it found that this did not always ensure that applicants knew what needed to be addressed.

The Department stated that its staff did a further review of the summaries of the comments and overall, the staff found that the summaries did not deviate significantly from the reviewers' comments.

The Department stated that it modified the process after it was initiated without amending the original planning documents and that in the future it will take steps to ensure that all plans for review of applications are followed or amended when necessary.

**OIG Response**
We have modified the wording of the report to clarify what occurred. The statute did not provide a process for expert review; however, the Department issued guidance to establish the role of reviewers' comments. The process actually undertaken by the Reading First program office, however, differed from the process outlined in its guidance. There is no evidence to show that the Reading First program office communicated these changes to either reviewers or applicants. In addition, there is no evidence that the Reading First program office ever sent the actual Panel Chair Summaries to applicants. The report outlines those instances where the Department-prepared summaries deviated significantly from the reviewers' comments and were not always accurate representations of the reviewers' comments.


**FINDING 2B –   The Department Awarded Grants to States Without Documentation That the Subpanels Approved All Criteria**

**Department Comments**
The Department stated that the program statute did not require the panel to approve final applications and that the panels were advisory, even though the program office tried to follow the recommendations of the panels. The Department also stated that in a number of cases a review of a resubmitted application revealed minor remaining issues, and it was not practical to always reconvene a subpanel.

**OIG Response**
No changes have been made to this finding.

We recognize that the panel served an advisory role in recommending the approval of final applications. In the specific examples provided in our report, the remaining issues were not minor.


**FINDING 3 –   The Department Included Requirements in the Criteria Used by the Expert Review Panels That Were Not Specifically Addressed in NCLB**

**Department Comments**
The Department commented that our report suggested the guidance issued by the Department may not include review criteria not specifically stated in the statute. The Department stated that the Reading First Criteria sets forth guidance on what criteria the subpanels are likely to use in reviewing State applications for Reading First grants. The Department further stated that States were reminded that they must meet all program requirements in order to receive funding and that this document was merely guidance.

The Department stated that the "Meets Standard" column would describe the conditions that reviewers will expect all State applications to meet. The Department acknowledged that in a few instances, the information in the "Meets Standard" column was not specifically required; it merely provided information on a submission that would be good practice and was helpful in ensuring good program management by the State.

The Department also stated that it did not receive complaints from States that the guidance was onerous.

**OIG Response**
No changes have been made to this finding.

We recognize the Department's interest in developing high-quality programs; however, criteria not specifically stated in the statute should not have been included in the "Meets Standard" column, but rather in the "Exemplary" column, which was the place identified by the Department to list additional criteria that it believed would help encourage high-quality projects.

Despite the Department's assertion that the document was merely guidance, the Reviewer Guidance states that panelists who reviewed the applications were to use *only* the criteria provided in the guidance.

**FINDING 4 –**    **In Implementing the Reading First Program, Department Officials Obscured the Statutory Requirements of the ESEA; Acted in Contravention of the GAO *Standards for Internal Control in the Federal Government*; and Took Actions That Call Into Question Whether They Violated the Prohibitions Included in the DEOA**

**Department Comments**
The Department stated that this section of the report cites a number of informal internal communications. In the introduction to its specific comments, the Department expressed concern that it may be too easy (and inaccurate in some instances) to read interpretations into, or draw conclusions about, a person's professional intent or actions solely from raw, unfiltered, informal snapshots of information.

The Department commented that while it is clearly the State's responsibility to select and approve programs for use by participating LEAs, the Department must ensure that only programs that meet statutory requirements are implemented. The Department further stated that when it becomes aware of programs that may not meet these provisions, it is incumbent upon the Department to raise that issue and question that action. The Department stated that it is not aware of information showing inappropriate actions to require particular programs or approaches.

**OIG Response**
No changes have been made to this finding.

Final Report
ED-OIG/I13-F0017                                                                              Page 32

The statements quoted in our report were not informal communications. The Reading First Director's communications were written using a Department e-mail account in his role as the Reading First Director. In preparing its response, the Department reviewed all of the e-mail communications quoted in this report. The Department's response does not suggest any instances where quotations were used out of context or inaccurately.

We agree that the Department must ensure that only programs that meet statutory requirements are implemented. If the Department was aware of programs that did not meet the statutory requirements, it should have shared that information formally and transparently. In this instance, that is not what occurred.

While the Department stated that it is not aware of information showing inappropriate actions to require particular programs or approaches, the actions reflected in this report raise serious concerns about the conduct of Department officials with respect to the limitations imposed by §3403(b) of the Department of Education Organization Act.

**Other Department Comments**
In the introduction to its specific comments, the Department fully acknowledged its responsibility to implement programs with fairness and integrity and to follow the law and its own guidance. We strongly concur. When, as here, that does not occur, it can only serve to undermine the public's confidence in the Department and its implementation of major programs, such as Reading First. As the Department notes, it is incumbent upon all Department employees "to take painstaking care to maintain the public trust."

# OBJECTIVES, SCOPE, AND METHODOLOGY

The objectives of our inspection were to:

1. Determine if the Department selected the expert review panel in accordance with the No Child Left Behind Act of 2001, Section 1203(c) and if the Department adequately screened the panel members for possible conflict of interest issues;

2. Determine if the expert review panel adequately documented its reasons for stating that an application was unready for funding; and

3. Determine if the expert review panel reviewed the applications in accordance with established criteria and applied the criteria consistently.

Through the course of our fieldwork, we identified a fourth item of concern related to actions that were contrary to statutory requirements of the ESEA, the GAO *Standards for Internal Control in the Federal Government*, and the DEOA.

We began our fieldwork on September 28, 2005, and we conducted an exit conference on July 18, 2006.

We interviewed Department staff in the Reading First program office and in OGC. We reviewed Department guidance and other documentation. In addition, we reviewed Department correspondence related to the Reading First program.

We also reviewed the applications from the following 11 States and one territory: Connecticut, Georgia, Kentucky, Massachusetts, Michigan, Nevada, New York, North Carolina, North Dakota, Virginia, Wisconsin, and Puerto Rico. We also reviewed the individual panelists' Technical Review forms, the Panel Chair Summary forms, the Department's Expert Review Team Reports, and the official grant file for each of the 12 applicants.

Our review focused on nine of the 25 criteria each application was required to meet:

- State Outline and Rationale for Using SBRR;
- Instructional Assessments;
- Instructional Strategies and Programs;
- Instructional Materials;
- Instructional Leadership;
- District and School Based Professional Development;
- Evaluation Strategies (Improving Reading Instruction);
- State Professional Development Plan; and
- Evaluation Strategies (State Reporting and Evaluation).

We interviewed officials from 10 of the States in our sample.

We also obtained documentation relating to the nomination of panelists.  We interviewed appropriate officials from NIFL, NICHD, and NAS about the panel nominations.  We also obtained completed conflict of interest questionnaires and panelist resumes.

Our inspection was performed in accordance with the 2005 President's Council on Integrity and Efficiency Quality Standards for Inspections appropriate to the scope of the inspection described above.



THE SECRETARY OF EDUCATION
WASHINGTON, DC 20202

August 29, 2006

MEMORANDUM TO JACK HIGGINS

FROM:            Margaret Spellings  /s/

RE:              Draft Inspection Report: *The Reading First Program's Grant Application
                 Process*

I am in receipt of the Draft Inspection Report: *The Reading First Program's Grant Application
Process* (Control Number ED-OIG/I13-F0017) of August 2006 and cover memo of August 8,
2006, from Cathy Lewis, your Assistant Inspector General for Evaluation, Inspection, and
Management Services, to Dr. Henry Johnson, Assistant Secretary for Elementary and Secondary
Education.  Thank you for your hard work on this project.

I have reviewed the report, concur in all the recommendations, and will proceed to implement
the recommendations immediately.  The Department will separately provide formal, detailed
comments on the draft report prior to the deadline of September 7, 2006.

Because of its effectiveness in improving student achievement, I am deeply committed to the
successful continuation of No Child Left Behind's (NCLB) Reading First program, the largest
and most focused early reading initiative in our nation's history.  Reading First is one of the best
tools we have to achieve the NCLB goal of bringing every student in America up to grade level
in reading and math by 2014.

State programs funded by Reading First have already served more than 1.7 million students and
more than 101,000 teachers have benefited from professional development.  The program helps
teachers translate scientific research on how children learn to read into practical tools for
effective classroom instruction.  While the Reading First program is still in its early years, we are
encouraged by its success thus far.  Thanks to Reading First, students struggling with reading are
far more likely to get the help they need from teachers with professional development training.

The program is producing positive results for America's students and examples of its success are
evident across the nation.  The long-term trend data from the National Assessment of
Educational Progress (NAEP), indicate that over the last five years, more reading progress has
been made among nine-year-olds than in the previous 28 years combined.  Reading scores for
African-American and Hispanic-American nine-year-olds have reached all-time highs.  I believe
that this is due in part to the contributions of Reading First and other programs under the No
Child Left Behind Act.

A study by researchers at the University of Michigan showed Reading First students in that state
are making continuous gains across the board from year to year.  In the state of Washington,
Reading First students – 84 percent of whom are from low-income families – demonstrated

Page 2

a 22-percentage point gain after the program had been implemented for two years. Over that same period, the numbers of students from each of the various other subgroups participating in Washington's Reading First program reading at or above grade level have also increased very significantly. We are receiving positive reports about the success of Reading First programs in a number of states.

With your recommendations, we will build on the promise and successes of Reading First thus far. Thank you again for your work in helping to ensure the effectiveness and integrity of the Department's programs.


cc:    Cathy H. Lewis
       Dr. Henry Johnson



THE SECRETARY OF EDUCATION
WASHINGTON, DC 20202

September 19, 2006

MEMORANDUM TO JACK HIGGINS

FROM:       Margaret Spellings  /s/

SUBJECT:    Draft Inspection Report:  *The Reading First Program's Grant Application Process*

I am writing in further response to the Draft Inspection Report: *The Reading First Program's Grant Application Process* (Control Number ED-OIG/I13-F0017) of August 2006, and the cover memo of August 8, 2006, from Cathy Lewis, Assistant Inspector General for Evaluation, Inspection, and Management Services, to Dr. Henry Johnson, Assistant Secretary of Elementary and Secondary Education.

I once again want to thank you and your staff for your hard work in preparing this draft report.  I provided an initial response to the report on August 29, 2006, and as I indicated in that response, I concur in all the recommendations in the draft and I have begun to take steps to address each of the recommendations in an effective and expeditious manner, and I am planning to take actions beyond the recommendations outlined in the report.  I have included information on some of the steps I have taken or intend to take in the attachment to this response.

The main focus of this memorandum and attachment, and a separate letter and an enclosure from Dr. Henry Johnson, is to provide you with detailed comments on the draft report.  I have worked with Dr. Johnson in reviewing the draft report very carefully and while we found the draft recommendations and much of the discussion in the draft findings in the draft report to be very helpful, we do not agree with all of the key points made in the draft findings.  I asked Dr. Johnson to respond more fully to the findings in the draft report.  In the enclosure to his letter, he has summarized in detail our comments and reactions to the findings.

I acknowledge that some of the actions taken by Department officials as described in the draft report reflect individual mistakes.  Thus, I am disappointed by what I have read about some aspects of the early implementation of the Reading First program.  Although the events occurred before I became Secretary of Education in 2005, that does not lessen my concern about these actions and my commitment to address them.

The Department has over 4,000 employees and administers a budget of about $88.9 billion per year in fulfilling our critical mission.  I am proud to work with dedicated and talented professionals.  When we have fallen short, whether in professional judgment, or in the management of programs, it is our job to move forward quickly and effectively to

*Our mission is to ensure equal access to education and to promote educational excellence throughout the nation.*

Page 2 – Jack Higgins

address those mistakes, and strengthen the management and administration of our programs.

The Office of the Inspector General has a serious and difficult responsibility to help us ensure that the programs of the Department are run effectively and efficiently, as well as to help ensure that the people of the Department operate at the highest levels of performance and with the utmost integrity. I remain confident in the overall integrity of the Reading First program, and I am very encouraged by its success. But I am disturbed, at a minimum, by any conduct that even has the appearance of affecting the credibility of or undermining confidence in the Department's work. I believe that taking steps to implement your recommendations will address these matters.

I am mindful of the current information available on the effectiveness of the Reading First program. As I mentioned in my earlier response, early evidence indicates that the Reading First program has been very successful since its enactment in 2002 as one of the key components of *No Child Left Behind* (NCLB). As noted in late July when the Department's interim report was released evaluating the early implementation of the Reading First program, Reading First has had a significant positive impact for the students and teachers it has served. The program is helping millions of children and providing teachers with high-quality, research-based support.

As we push ahead toward our ultimate goal of every child reading and having math skills appropriate to their grade levels by 2014, the Reading First program is an important tool in our efforts. I am committed to using the recommendations in your report to build on the early successes of the program and improve the management and effectiveness of the program further. Integrity, objectivity, and professionalism are critical to effective program operations and public confidence in the operation of those programs. I am passionately committed to those principles.

We serve the public, and their trust and confidence is paramount to our work. I will continue to work to honor that trust and confidence, expecting the highest standards of integrity and excellence from Department staff.

Attachment

**Action Steps Addressing Draft Inspection Report Recommendations**

Here are some of the steps that I have taken or will take in the near future to address the recommendations in the Draft Inspection Report: *The Reading First Program's Grant Application Process* (Control Number ED-OIG/I13-F0017) of August 2006 --

- I have reassigned the leadership of the Reading First program within the Office of Elementary and Secondary Education so that it can be more closely managed. We will be forming a new management team for the program in the very near future, and I will be directing the new team to individually contact each of the State Reading First Directors to discuss progress to date and any concerns or questions they may have in moving forward with the Reading First program. I also will direct the new team to send a notice to each contractor to emphasize the importance of providing objective, impartial technical assistance and other support in their work.

- By October 1, 2006, the Department will be sending a letter to the State Reading First Directors that will provide an opportunity for any State to notify the Department if it has concerns about the expert panel process used in 2002 and 2003 to make recommendations to then-Secretary Paige regarding their State's application.

- By December 31, 2006, Department staff will complete a review of all Reading First applications approved by the Department to determine whether all applications were approved consistent with applicable requirements, and whether amendments will be necessary.

- Staff from a cross-Department team will review publicly disseminated guidance and other materials related to the Reading First program to ensure that they are accurate and impartial. If there is inappropriate material in the guidance, I will make appropriate changes. I will also have this team help guide the future management of the Reading First program and the implementation of programs under the Elementary and Secondary Education Act after its scheduled reauthorization.

- Staff from our Grants Policy and Oversight Staff and the Office of the General Counsel will --

    o Review and expand the protocol for reviewing potential conflicts of interest when the Department uses outside review panels, to include both formula and discretionary grant panels; and

    o Develop a protocol for the handling of review panel evaluations to improve transparency and communication in the application and review process. For example, if summaries are made of panel comments that are to be provided to applicants, the protocol at a minimum should call for

Page 2

copies of those summaries to be provided to review panels when the summaries are sent to applicants. In addition, staff will consider whether the protocol should provide a draft of summaries to review panels for comment before they are sent to applicants.

- Each Principal Officer in the Department will discuss with their respective program managers any concerns related to program management or administration, and provide me with any recommendations for further strengthening those areas.

- I will be sending a memorandum to all Department program managers reminding them of the importance of impartiality in the performance of their duties, and the importance of adhering to all relevant program and grant statutory provisions in the Department of Education Organization Act, the General Education Provisions Act and the NCLB Act, including the prohibitions against controlling and directing curriculum and instruction. That memorandum will also emphasize the importance of early consultation with our Office of the General Counsel on legal issues, including matters of legal ambiguity or interpretation of statutes and regulations, as well as the need to adhere to the advice received from our legal counsel.

- I will require annual training on the standards for internal controls, similar to existing annual training requirements for ethics and for computer security, so that our systems, processes, and behaviors provide strengthened assurance of professional responsibility and full compliance with laws and regulations, as well as effective and efficient operations (and reliability of financial reporting, which is a major control category not at issue in this report). The training will address the statutory prohibitions discussed above against controlling and directing curriculum and instruction, and will incorporate the five standards for internal control, each of which apply to the programmatic, compliance, and financial aspects of the Department's operations –

  - Control Environment that sets a positive and supportive attitude toward internal control and conscientious management;
  - Risk Assessment from both external and internal sources;
  - Control Activities to help ensure that management directives are implemented;
  - Information and Communication that is relevant, reliable, and timely; and
  - Monitoring to assess the quality of performance over time.

UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF ELEMENTARY AND SECONDARY EDUCATION

SEP 1 9 2006

Honorable John P. Higgins
Inspector General
U.S. Department of Education
Washington, D.C. 20202

Dear Mr. Higgins:

I am writing in further response to the Draft Inspection Report: *The Reading First Program's Grant Application Process* (Control Number ED-OIG/I13-F0017) of August 2006 and the cover memo of August 8, 2006 from Cathy Lewis, Assistant Inspector General for Evaluation, Inspection, and Management Services. As mentioned in the Secretary's letter on this subject dated today, I am responding more fully to the findings in the draft report.

We have reviewed the draft report very carefully and while we found the draft recommendations and much of the discussion in the draft findings in the draft report to be very helpful, we do not agree with all of the key points made in the draft findings. As noted in the enclosure, there are a few matters described in the draft report that are subject to more than one interpretation. I have summarized in detail our comments and reactions to the findings in the enclosure.

I once again want to thank you and your staff for your hard work in preparing this draft report. Please let me know if you have any questions about our response.

Sincerely,

Henry L. Johnson

Enclosure: Specific Comments on the Draft Inspection Report Findings

**Enclosure: Specific Comments on the Draft Inspection Report, *The Reading First Program's Grant Application Process* (Control Number ED-OIG/I13-F0017)**

Introduction: The Office of the Inspector General (OIG) has an important role in helping the Department preserve the public trust and in helping the Department ensure that its implementation of programs and other processes are fair and appropriate and have integrity. The law must be followed, and we take very seriously the duty to execute and implement the laws faithfully, and the OIG's work helps to strengthen our effectiveness and efficiency by being vigilant in looking out for instances of waste, fraud, and abuse. We know that the OIG is well aware that the law is not simple, and often, implementation is not easy. The responsibility of the Department in administering some of the more intricate programs such as Reading First, demands very sophisticated interpretations of law and the role of the Executive Branch.

The larger context in which the Executive Branch works is critical to appreciating an agency's responsibility to faithfully implement legislation passed by Congress and signed into law by the President, sometimes with very little time to carry out its responsibilities. It is incumbent on the Executive Branch and the agency in particular to fill in the details left out by Congress, consistent with the law. Much of what is included in regulations or guidance will not specifically have been required or addressed by the statute. In fact, the absence of substantive or procedural detail in many statutes is the primary reason why regulatory or guidance documents are issued.

In considering the findings outlined below, we are mindful of the complex provisions that were being put in place in the Reading First program, and needed to be implemented in the early months just after the statute was enacted. Guidance describing and strongly encouraging a high standard for performance that is consistent with, but not specifically required by a statute, is often crucial to implementing a program effectively and carrying out its statutory purposes.

With this background, I have a few areas of concern with regard to the draft report. In the early months of implementation, some statements made by program officials demonstrated poor judgment. However, they may have been taken out of context and they should not be construed to be the goals of Department implementation. Additionally, I am concerned that sometimes actions taken in the interest of strengthening the integrity of the process are criticized for not going even further. For example, the peer review subpanels properly could have been established under the statute and proceeded without a process to identify potential conflicts of interest. The Department established a peer review process that was fair and had integrity

Like you in the Office of Inspector General, as public servants, integrity is our watchword. Personal views cannot be allowed to interfere with professional responsibilities. However, it worries me that in today's world of constant communication via text messaging, instant messaging, and e-mails, it may be too easy (and inaccurate in some instances) to read interpretations into, or draw conclusions about, a person's

professional intent or actions solely from raw, unfiltered, informal snapshots of information.

In short, having carefully reviewed the draft findings of the report, we agree with some of the findings, but have some concerns about others. Nonetheless there is room for differing, reasonable interpretations in some of the details. Public service is a noble calling, and we need to take painstaking care to maintain the public trust. In that spirit, even when we have some concerns with portions of OIG findings, as mentioned earlier, the Department will implement all of the recommendations made by the OIG that will further ensure the integrity of the Department's implementation of programs.

Below, I discuss each of the findings in the draft and our responses to them. I very much appreciate the opportunity to comment.

### *Finding 1A* – **The Department Did Not Select the Expert Review Panel in Compliance with the Requirements of NCLB**

We have reviewed this finding and agree with the OIG finding to the extent that the requirement for establishing the expert panel as required by the statute was not fully adhered to. As confirmed in the draft report, the Department consulted with the National Academy of Sciences (NAS) and the National Institute of Child Health and Human Development (NICHD) and the National Institute for Literacy (NIFL) and each organization nominated at least three panelists. We also agree that the Department had considered and the Office of the General Counsel had recommended the establishment of a twelve-member "Advisory and Oversight Panel" made up of individuals nominated by the NAS, the NICHD, and NIFL in order to meet statutory requirements. It is regrettable that this panel was not established. In the early period of the implementation of the Reading First program, it is clear that there was an effort to expedite the initial steps to get the program up and running quickly and effectively to get needed services and resources into States' classrooms for the sake of the students. In a few instances noted in the OIG draft report, this resulted in some steps being overlooked; at the same time, many effective measures were taken.

We are not aware of any information that would show that the lack of establishing a twelve-member "Advisory and Oversight Panel," that would have met the requirements of the statute, resulted in any inappropriate effects or disadvantage to any State. However, the Department will undertake to discuss with State representatives and review applications to determine if there were such effects, and by December 31, 2006, the Department will determine whether all applications were approved consistent with applicable requirements, and whether amendments will be necessary.

### *Finding 1B* – **While Not Required to Screen for Conflicts of Interest, the Screening Process the Department Created Was Not Effective.**

We have some concerns with this finding. As acknowledged in the draft report by the OIG, the Department was not required to screen for conflicts of interest in this process.

The Department decided to take that extra step and establish a screening process. We know that while additional steps could have been taken, the steps we took were effective and more than what was required by law.

Even though it was not required to establish a screening process, the Department voluntarily did so, because the integrity of the subpanel process was very important to the Department. The Reading First program office went beyond what it was required to do and, with the cooperation of the Ethics Division of the Department's Office of the General Counsel (OGC), developed its own screening process, and it was faithfully implemented. When potential panelists were identified as having specific connections to programs, assessment, or textbooks on the Conflict of Interest form (a form that OIG concedes the Department did not have to use), an OGC ethics attorney provided guidance to the program office, and in each instance, and the Department took appropriate action to ensure that no conflict occurred.

Although Reading First is not a true competitive grant program and as such not subject to requirements for establishing formal processes to avoid conflict of interests, the Department used the conflict of interest process and forms from its competitive grant programs as its guide. The Department reasonably adapted the competitive grant conflict of interest procedures to the Reading First program.

OIG identified six panelists whose resumes revealed "significant professional connection" to a teaching methodology that requires the use of a specific reading program. There is no available information to show that that these connections resulted in any problematic behavior or that that any of these panelists reviewed a state application that included such a program.

The Reading First program office also established subpanels of five members (in the discretionary grant process in which avoiding conflicts of interests is even more necessary, the panels or subpanels are generally only three members). This provided an additional check to screen out or eliminate the impact of any alleged biases of individual reviewers.

The draft report suggests that an inappropriate process with inappropriate standards were used. The Department used the standard of "avoiding financial connections" to programs or products as the standard. The OIG suggests that the appropriate standard should have been "significant professional connections to a teaching methodology that requires the use of a specific reading program." This standard is not easy to define, and implement, and could rule out many practitioners who worked on a particular approach, thus eliminating the most experienced and qualified practitioners. The OIG draft report demonstrated no conflict of interests and no ill effects of any alleged issues in this area.

The OIG finding suggests that the Department could have been better off by just meeting the minimal requirement of the law, which is that no conflict of interest screening process is required, and none needed to be implemented. But this is not the path the Department took. The Department continues to strive to ensure integrity beyond just meeting the

minimal requirements of the law. The Department provides significant training and services in the area of ethics, and did more than necessary to ensure that there was integrity in this aspect of the Reading First program. The Department is committed to taking even more steps to ensure integrity and, where appropriate, will increase its conflict of interest procedures in programs in which outside panels are involved in selecting and recommending the selection of grant awards.

### Finding 2A – The Department Replaced What the Law Intended to be a Peer Review Process with Its Own Process.

In the draft report, the OIG equates the fact that the program office summarized the reviewers' comments into a concise and more focused form as "replacing the…intended…process with its own process." The Department did not replace the process required by the statute. The statute does not establish the role of reviewers' comments. In fact, the peer reviewers on the subpanels were considered to be advisory and the Department utilized them in a role consistent with the statute.

While the peer reviewers were generally helpful with their comments, the program office found that some panelists provided comments that were difficult to read or digressed somewhat from the criterion under review. Although the program office originally intended in its *Reviewers Guidance* to have reviewers provide comments directly to the applicants, they found that this did not always ensure that applicants knew what needed to be addressed. The program office took steps to try to improve the process and, in a number of cases, this resulted in a more efficient process that was easier for States to use.

While we acknowledge that there may be examples where the reports could have been clearer about the subpanels' comments, in a number of cases, the summaries clarified the comments so that they could be addressed more effectively. Department staff did a further review of the summaries of the comments and overall, they found that the summaries did not deviate significantly from the reviewers' comments. This change in plan did not replace a process required by law.

In this case, however, the process was modified after it was initiated without amending the original planning documents. In the future, the Department will take steps to ensure that all plans for review of applications are followed or the plans will be amended when necessary.

### Finding 2B – The Department Awarded Grants To States Without Documentation that the Subpanels Approved all Criteria.

The OIG found in its draft report that of twelve application files reviewed by OIG, in four cases there was no documentation to show that the subpanel finally approved the plans. As discussed, the program statute did not require this step, and the subpanels were advisory, even though the program office tried to follow in good faith, the recommendations of the subpanels in any event.

However, this step must be viewed in the perspective of the overall review process. In some instances, the process with a State went through a number of revisions and took over a year to complete. In a number of cases, a review of a resubmitted application revealed minor remaining issues, and it was not practical to always reconvene a subpanel, especially when it was just being asked review minor changes. Generally, our actions in this area prevented undue demands on the panelists' time and prevented the lapse of time that it would have taken to convene an additional subpanel meeting or call to discuss a minor issue. It is appropriate that Department officials are the primary source of communication in these matters with the State representatives. The Department made public announcements of all grant approval and awards, and the panelists were generally kept aware of all approvals; there was never any instance in which a panelist complained that they were not involved in the final approval or that a final approval was inappropriate.

While we have some concerns with the OIG's finding in this case, we acknowledge that better documentation of the Department work with a subpanel's decision could have been maintained, and, in some cases, it would have been more appropriate to reconvene a subpanel. This will be done in future uses of panelists for this and other programs.

### *Finding 3* – The Department Included Requirements in the Criteria used by the Expert Review Panels That Were Not Specifically Addressed in NCLB.

This finding concerns guidance issued by the Department, in which the OIG in its draft reports seems to suggest that the Department may not include review criteria not specifically stated in the statute. The OIG found that the expert subpanel reviewers reviewed the application in accordance with criteria provided to them in the guidance and applied the criteria consistently. But the OIG appears to have concerns, because the criteria included conditions not specifically required in the statute.

This guidance document sets forth guidance on what criteria the expert subpanels are likely to use in reviewing State applications for Reading First grants. In the introduction to the guidance, States were reminded that they must meet all program requirements in order to receive funding, and that this document was merely guidance. The information in the document is provided in a lengthy, multi-paged chart that is divided into three columns, a "Meets Standard" column which describes the conditions that reviewers will expect all State applications to meet, an "Exemplary" column which describes conditions that, when met in addition to those listed under 'Meets Standard,' would be expected to result in the highest quality Reading First programs, and a 'Does Not Meet Standard' column which provides guidance on conditions that would not meet the standard for each criterion.

In general, the entries in the "Meets Standard" column were consistent with the program statute. In a few instances, the information in that column was not specifically required; it merely provided information on a submission that would be good practice and was helpful in ensuring good program management by the State. These few instances that "went beyond the statute" were generally minimal and did not appear to involve

exceeding the authority of program officials as provided in the Department of Education Organization Act and other enabling legislation. We did not receive complaints from States that the guidance was onerous; it is our understanding that the guidance was helpful.

The OIG draft report identifies that three criteria addressing "coherent instructional design" and "a protected dedicated block of time," and "small group instruction as appropriate" are the specific criteria suggested in the guidance that were not specifically in the statute. Each of these criteria was logical and a matter of good instructional practice that would be very helpful to the establishment of high quality programs; it is what we would want most programs to contain. All are supported by research as effective practices.

Another example of where the guidance goes beyond the specific language of the statute was that the guidance appeared to require the submission of more information on the planned subgrant competitions that would be held by each State. This is an effective way to help ensure that States would run efficient, effective and fair competitions for subgrants consistent with section 1202(b)(4) of the Reading First statute. The material in the "Exemplary" column also appeared to set forth excellent practices as suggestions for submitting a good application.

While the OIG cites e-mails from the Reading First program director in which he indicates that this is an "aggressive approach," the guidance merely adds good examples to the language of the statute. We should continue the Department's effective practices in many programs to encourage high-quality projects that go beyond the minimum standards of the statute. Overall, the Reading First guidance has proven to be helpful and it is consistent with the law, and consistent with helping ensure the submission of high quality applications.

*Finding 4* – **In Implementing the Reading First Program, Department Officials Obscured the Statutory Requirements Of ESEA; Acted in Contravention of the GAO** *"Standards for Internal Control in the Federal Government"*; **and Took Actions That Call into Question Whether they Violated the Prohibitions Included in the DEOA.**

This section of the report cites a number of informal internal communications, which show "behind-the-scenes" bravado, if not loose and inappropriate language on the part of the Reading First program director. The communications often show the intention of the program director to be bold and aggressive in drafting documents. The program officials took actions that were often intended to get guidance out to States quickly when the States were eager for materials on good reading practices and approaches that they might consider.

At the same time, the Department continuously and clearly stated that there was no approved list of approaches or programs in the Reading First program. These documents

are still posted on the Department website and widely disseminated, and were heralded by then Secretary Paige on numerous occasions.

While it is clearly the State's responsibility to select and approve programs for use by participating local educational agencies, the Department must ensure that only programs that meet statutory requirements are implemented (for example, that they be "based on scientifically based reading research"). When the Department becomes aware of programs that may not meet these provisions, it is incumbent upon the Department to raise that issue and question that action. We are not aware of information showing inappropriate actions to require particular programs or approaches.

We agree that there were mistakes made by a program official, but ultimately, it is officials at all levels in the Department that are responsible for the effective and efficient management of the Reading First program. That is why we are taking actions to ensure the integrity and the proper implementation of the program.

**EXHIBIT B**



🖶 Print                                            ✂ Close Window

## Paige Announces Names of Experts Who Will Review Reading First Applications
$900 Million in Reading First Grants to Go to States

**FOR RELEASE:**                                   **Contact:** Melinda Malico or Dan Langan
May 13, 2002                                        (202) 401-1576

U.S. Secretary of Education Rod Paige today announced 72 *Reading First* review panelists who will be tasked with reviewing state applications for $900 million in new *Reading First* grants. The *Reading First* program will help states and school districts improve K-3 reading instruction and student achievement based on methods proven by rigorous scientific reading research.

"This group represents the most experienced and expert reading researchers and education practitioners from around the country," said Secretary Paige. "Members of this panel will help ensure that states have comprehensive reading programs in place, using instructional methods guided by the best available research, so that we can make certain every child is receiving a quality education."

State applications will undergo a thorough review by the panel, which was chosen by the secretary of education, the National Institute for Literacy, the National Research Council of the National Academy of Sciences, and the National Institute of Child Health and Human Development of the National Institutes of Health. Those reviews will be used to make funding recommendations to the secretary and to provide comments and technical assistance to the states.

The panelists include those with expertise in acquisition of reading skills; the cognitive science of language and reading process; prevention of reading failure; scientifically based reading research; professional development; school leadership; classroom teaching; curriculum development; early intervention; psychology; assessment, measurement and evaluation; reading and learning disabilities; special education; management and accountability.

President Bush has made improving children's reading achievement central to his education reform agenda and has committed to helping every child learn to read by the end of grade three, Paige said. The president designed *Reading First* as the solution to poor reading achievement among U.S. students, based on proven research. Through *Early Reading First,* President Bush has also made acquisition of early language skills a focus of his administration's efforts to retool early childhood education and specifically Head Start programs for disadvantaged children.

The program was made law this year by a bipartisan majority of Congress under the *No Child Left Behind Act of 2001*. President Bush has asked Congress for even more funding in his FY 2003 budget request--$1 billion--to fund the second year of the program.

Panelists will ensure that state applications reflect the statutory requirements including those based on the National Reading Panel's comprehensive findings that effective reading instruction must include a combination of instruction in phonemic awareness, phonics, fluency, comprehension and vocabulary. The *Reading First* program centers on:

- improving the quality of classroom instruction;
- building instruction on scientific research proven to work in the teaching of reading;
- providing professional development in reading instruction for educators; and
- ensuring that educators have the resources and research to support the extraordinary initiative.

States with approved applications will begin to receive grants based on formula funding beginning July 1. Once funded, states will open competitions for subgrants to eligible school districts. A list of estimated state grants is available at: www.ed.gov/PressReleases/01-2002/estimates.html.

To help states prepare to implement *Reading First*, Paige hosted state teams of policymakers and key education leaders at three *Reading Leadership Academies* earlier this year.

The application for *Reading First* state grants is available online at: www.ed.gov/offices/OESE/readingfirst/grant.html.

### ###

### *READING FIRST* REVIEW PANEL

- Maria Elena Arguelles, Ph.D., *Research Assistant Professor, University of Miami*

- Janet Sloand-Armstrong, Ed.D. *Managing Director, Pennsylvania Training and Technical Assistance Network*

- Rebecca Barr, Ph.D., *Professor of Education, National Louis University*

- Donald Bear, Ph.D., *Professor of Curriculum & Instruction, College of Education; Director, E.L. Cord Foundation Center for Learning and Literacy, University of Nevada-Reno*

- Marsha Berger, *Former Deputy Director of the Educational Issues Department at the American Federation of Teachers*

- Muriel Berkeley, *President, Baltimore Curriculum Project*

- Frances Bessellieu, M.Ed., *Director of Reading and Reading Excellence Act Coordinator, Charlotte-Mecklenburg Schools (CMS)*

- Pauline Bigby-Jenkins, Ph.D., *Title I and ESL coordinator for Ann Arbor Public Schools, Michigan Reading Association Board of*

Case 1:06-cv-02086-HHK    Document 1-2    Filed 12/07/2006    Page 55 of 72

*Directors*

- Carmel Borders, M.A., *President, Tapestry Foundation; Presidential Nominee, National Institute for Literacy,*

- Susan Brady, Ph.D., *Professor of Psychology, University of Rhode Island*

- Kathleen Brown, Ph.D., *Director and Clinical Assistant Professor at the Reading Center in the Graduate School of Education, University of Utah*

- Joanne Carlisle, Ph.D., *Professor, Educational Studies, Research Scientist, Communicative Disorders Clinic, University of Michigan*

- Margaret Carnes, R.N., *Managing Director, Charlotte-Mecklenburg Education Foundation*

- Mary Cirillo, *Chairman and Chief Executive Officer of OPCENTER, L.L.C, Hudson Ventures*

- Carl Cole, Ph.D., *Director of Special Services, Bethel School District*

- Anne Cunningham, Ph.D., *Associate Professor, Graduate School of Education and Director, Joint Doctoral Program in Special Education, University of California-Berkeley*

- Shirley Dickson, *Director, Statewide Curriculum Initiatives and Director of Reading, Texas Education Agency*

- Jan Dole, Ph.D., *Associate Professor, Department of Teaching and Learning, University of Utah*

- Rebecca Felton, Ph.D., *Educational Consultant*

- Jack Fletcher, Ph.D., *Professor, Department of Pediatrics and Associate Director of the Center for Academic and Reading Skills at the University of Texas, Houston Health Science Center*

- Barbara Foorman, Ph.D., *Professor and Director of the Center for Academic and Reading Skills*

- Anne Fowler, Ph.D., *Senior Scientist, Haskins Laboratories*

- Catherine Froggatt, R.N., *Michigan State Director, The National Right to Read Foundation*

- Alice Furry, Ph.D., *Chief Administrative Officer; Project Director, UCLA Extension/Los Angeles Unified School District, Governor's Reading Initiative PreK-6, California Professional Development Reading Institutes*

- Norma Garza, *Director, United Way of Southern Cameron County "Success by Six" Initiative; Educational Excellence for Hispanic Americans Commission*

- Russell Gersten, Ph.D., *Professor, College of Education and Director, Eugene Research Institute, University of Oregon*

- Diane Haager, Ph.D., *Associate Professor, Special Education, California State University, Los Angeles*

- Susan Hall, M.B.A., *Consultant, International Dyslexia Association; Member, State of Illinois Reading Committees*

- Karen Harris, Ed.D., *Professor, Department of Special Education, University of Maryland*

- Marlene Henriques, Ed.D., *Teacher in Residence in Assessment Development, National Board for Professional Teaching Standards*

- Janie Hodge, Ph.D., *Associate Professor of Special Education, Clemson University*

- Estella Holliday, *Director, South Carolina Reading Initiative and Assistant Director, Office of Early Childhood Education, South Carolina Department of Education*

- Stephen Hooper, Ph.D., *Associate Professor, Departments. of Psychiatry and Psychology, University of North Carolina-Chapel Hill*

- Mark Hopper, Ph.D., *Vice President, Accountability Initiatives; Partner and Vice-President, Henderson, Hjermstad, Hopper, L.L.C*

- Kathy Howe, *Academic Collaborative Planner, St. Croix River Education District (Minnesota)*

- Dawn Hubbard-Miller, Ph.D., *Educational Trainer and Consultant, Northeast Kansas Education Service Center*

- Joseph Jenkins, Ph.D., *Professor, Special Education, College of Education, University of Washington*

- Linda Jenkins, *Assistant Superintendent for K-12 Curriculum Development and Implementation, Bremerton School District (Washington)*

- Ellin Keene, M.A., *Director of Literacy and Professional Development, University of Pennsylvania*

- Martin Kozloff, Ph.D., *Professor, Department of Specialty Studies, University of North Carolina-Wilmington*

- Sharon Kurns, *Supervisor Instructional Services, Special Education Division, Heartland Area Educational Agency (Iowa)*

- Zoee Larose, M.A., *Reading Connections Specialist, Alabama State Department of Education*

- John Lloyd, Ph.D., *Professor, Department of Curriculum, Instruction and Special Education and Chief Technology Officer at the Curry School of Education, University of Virginia*

- Marie Mancuso, *Director, Arizona Reading Initiative, Arizona Department of Education; Co-chair, Arizona Reading Initiative*

*Leadership Advisory Board*

- Robert Marino, *Baltimore City Public Schools*

- Patricia Mathes, Ph.D., *Associate Professor at the Medical School, Principal Investigator, Center for Academic and Reading Skills, University of Texas-Houston*

- Michael McKenna, Ph.D., *Professor of Education and Coordinator of Graduate Reading Programs, Georgia Southern University*

- Leslie McPeak, M.Ed., *Director of Literacy and School Support, Stanislaus County Office of Education, Modesto, California*

- Katherine Mitchell, Ph.D., *Director, Alabama Reading Initiative, Alabama Department of Education*

- Darryl Morris, Ph.D., *Professor of Language and Reading and Reading Clinic Director, Appalachian State University*

- Kelly Mueller, M.Ed., *Teacher, Jackson Park Elementary School, St. Louis, Missouri*

- Laura Murphy, *Teacher and Consultant*

- Caroline Novak, *Co-founder and President, A+ Education Foundation*

- Jean Osborn, M.Ed., *Consultant, Center for the Study of Reading, University of Illinois (retired)*

- Stan Paine, Ph.D., *Elementary School Principal, Springfield School District (Oregon)*

- Charles Perfetti, Ph.D., *Professor of Psychology and Linguistics and Director of the Laboratory for Reading and Language, University of Pittsburgh*

- Kristen Powell, Ed.D., *Administrator for School and Community Services, Orange County Department of Education, California*

- Craig Ramey, Ph.D., *Professor and Co-director, School of Nursing and Health Studies, Georgetown University*

- Sally Shaywitz, M.D., *Professor of Pediatrics and Director of Yale Center for Learning and Attention, Yale University*

- Mary Siano, M.A., *Certified ETS Trainer and Associate Developer, Educational Testing Service*

- Tim Slocum, Ph.D., *Associate Professor, Department. of Special Education, Utah State University*

- Susan Smartt, Ph.D., *Reading Specialist and Consultant, Smartt Johnson and Associates*

- Janet Spector, Ph.D., *Assistant Professor, College of Education and Human Development, University of Maine-Orono*

- Pam Stecker, Ph.D., *Associate Professor, School of Education and Acting Director of the Learning with Disabilities Program, Clemson University*

- John Stevens, *Texas Business and Education Coalition*

- Joseph Torgesen, Ph.D., *Professor, Department of Psychology, Florida State University*

- Lucia Townsend, *Human Resource Development Specialist, Florida Diagnostic and Learning Resource System*

- Fran Warkomski, *Director, Bureau of Special Education, Pennsylvania Department of Education*

- Ann Watanabe, M.S., *State Reading Resource Teacher, Pihana na Mamo Project, Maui District Office, Hawaii Department of Education*

- Joanna Williams, Ph.D., *Professor of Psychology and Education, Teachers College, Columbia University*

- Rhonda Wolter, *Title I Reading Specialist and Reading Coordinator, Bethel School District (Eugene, Oregon)*

- Elaine Zimmerman, *Executive Director, Connecticut Commission on Children*

###

&#9881; Print                          &#10005; Close Window

Last Modified: 09/15/2004

**EXHIBIT C**

2 of 2 DOCUMENTS

The Washington Post

October 1, 2006 Sunday
Final Edition

# Billions for Inside Game On Reading

**BYLINE:** Michael Grunwald

**SECTION:** Outlook; B01

**LENGTH:** 2189 words

President Bush's No Child Left Behind Act was premised on three revolutionary goals. The first was to focus on low-performing schools and students; hence, No Child Left Behind. The second was to beef up the federal role in education, enforcing national standards through testing. The third was to bring facts and evidence to the notoriously squishy world of education policy, promoting teaching methods backed by "scientifically based research" instead of instinct and fad. This was the least-publicized goal, but arguably the most vital; the phrase "scientifically based research" appeared more than 100 times in the landmark 2001 law.

The centerpiece of the new research-based approach was Reading First, a $1 billion-a-year effort to help low-income schools adopt strategies "that have been proven to prevent or remediate reading failure" through rigorous peer-reviewed studies. "Quite simply, Reading First focuses on what works, and will support proven methods of early reading instruction," the Education Department promised.

Five years later, an accumulating mound of evidence from reports, interviews and program documents suggests that Reading First has had little to do with science or rigor. Instead, the billions have gone to what is effectively a pilot project for untested programs with friends in high places.

Department officials and a small group of influential contractors have strong-armed states and local districts into adopting a small group of unproved textbooks and reading programs with almost no peer-reviewed research behind them. The commercial interests behind those textbooks and programs have paid royalties and consulting fees to the key Reading First contractors, who also served as consultants for states seeking grants and chaired the panels approving the grants. Both the architect of Reading First and former education secretary Roderick R. Paige have gone to work for the owner of one of those programs, who is also a top Bush fundraiser.

On Sept. 22, the department's inspector general released a report exposing some of Reading First's favoritism and mismanagement. The highlights were internal e-mails from then-program director Chris Doherty, vowing to deny funding to programs that weren't part of the department's in-crowd: "They are trying to crash our party and we need to beat the [expletive] out of them in front of all the other would-be party crashers who are standing on the front lawn waiting to see how we welcome these dirtbags."

Doherty has since resigned, and Education Secretary Margaret Spellings has pledged to review Reading First, emphasizing that the "individual mistakes" detailed in the report occurred before she became secretary. Still, Spellings expressed full confidence in the overall program: "Thanks to Reading First, struggling students are far more likely to get the help they need from teachers using scientifically based classroom reading instruction."

But the report barely scratched the surface of the incestuous process that dominated the formation of Reading First. The initiative didn't promote scientifically based reading instruction, the third goal of No Child Left Behind. And it's providing ammunition to critics of the second goal, strong national standards. The billion-dollar question is whether it may imperil the first goal: Will some children get left behind?

http://w3.nexis.com/new/delivery/PrintDoc.do?fileSize=17315&job...

Bush administration officials frequently say that Reading First does not play favorites or intrude on local control, that states and districts are free to choose their own textbooks and programs -- as long as they're backed by sound science. But aggressive muckraking by the newsletter Title 1 Monitor and reading advocates at the Success for All Foundation have eviscerated those claims, and the inspector general's report officially contradicted them, accusing the department of breaking the law by promoting its pet programs and squelching others. In his internal e-mails, Doherty frequently admitted using "extralegal" tactics to force states and local districts to do the department's bidding. A report by Success for All documented how state applications for Reading First grants that promoted the preferred programs were the only ones approved.

In fact, the vast majority of the 4,800 Reading First schools have now adopted one of the five or six top-selling commercial textbooks, even though none of them has been evaluated in a peer-reviewed study against a control group. Most of the schools also use the same assessment program, the same instructional model, and one of three training programs developed by Reading First insiders -- with little research backing.

"They kept denying it, but everybody knew the department had a list," said Jady Johnson, director of the Reading Recovery Council of North America. "They're forcing schools to spend millions on ineffective programs."

To some extent, the controversy over Reading First reflects an older controversy over reading, pitting "phonics" advocates such as Doherty against "whole language" practitioners such as Johnson.

The administration believes in phonics, which emphasizes repetitive drills that teach children to sound out words. Johnson and other phonics skeptics try to teach the meaning and context of words as well. Reading First money has been steered toward states and local districts that go the phonics route, largely because the Reading First panels that oversaw state applications were stacked with department officials and other phonics fans. "Stack the panel?" Doherty joked in one e-mail. "I have never *heard* of such a thing . . . {It}harrumph, harrumph{gt}." When Reid Lyon, who designed Reading First, complained that a whole-language proponent had received an invitation to participate on an evaluation panel, a top department official replied: "We can't un-invite her. Just make sure she is on a panel with one of our barracuda types."

Doherty bragged to Lyon about pressuring Maine, Mississippi and New Jersey to reverse decisions to allow whole-language programs in their schools: "This is for your FYI, as I think this program-bashing is best done off or under the major radar screens." Massachusetts and North Dakota were also told to drop whole-language programs such as Rigby Literacy, and districts that didn't do so lost funding. "Ha, ha -- Rigby as a CORE program?" Doherty wrote in one internal e-mail. "When pigs fly!"

Said Bruce Hunter, a lobbyist for the American Association of School Administrators: "It's been obvious all along that the administration knew exactly what it wanted."

But it wasn't just about phonics.

Success for All is the phonics program with the strongest record of scientifically proved results, backed by 31 studies rated "conclusive" by the American Institutes for Research. And it has been shut out of Reading First. The nonprofit Success for All Foundation has shed 60 percent of its staff since Reading First began; the program had been growing rapidly, but now 300 schools have dropped it. Betsy Ammons, a principal in North Carolina, watched Success for All improve reading scores at her school, but state officials made her switch to traditional textbooks to qualify for the new grants.

"You can't afford to turn down the federal money," Ammons said. "But why should we have to give up on something that works?"

The answer lies in the Reading First grant process, which was almost comically skewed. Michigan was the first state approved, after it simply proposed to adopt the five best-selling textbooks. But when Rhode Island officials proposed to require "high-quality reading programs that meet the test of having a scientific research base," they were rejected. Doherty told them to check out Michigan's list, so they cut and pasted it into their application, while suggesting that districts could still adopt other programs justified by research. They were rejected again. So they limited their program to the textbooks. Only then were they approved. Similarly, Oklahoma unsuccessfully proposed to require reading programs backed by three years of longitudinal data before it got the hint and proposed the Michigan list.

So instead of advocating scientifically based reading programs, Reading First has promoted programs with "key elements" endorsed by a national reading panel, which could describe almost any program. It may not be a coincidence

that the initiative was essentially outsourced to a few experts with a dizzying array of apparent conflicts of interest.

For example, when the department needed reviewers to evaluate reading assessment programs, it contracted with a University of Oregon team led by Edward Kame'enui, Roland Good and Deborah Simmons. Good had developed an assessment called Dynamic Indicators of Basic Early Literacy Skills (DIBELS), and Kame'enui, Good and Simmons had all served on the design team for Voyager Passport, a remedial program built around DIBELS. Ultimately, DIBELS was the only assessment used in Reading First, and Voyager was the most popular supplemental program.

Similarly, the department steered states to just three providers of professional development services: Kame'enui and Simmons at Oregon, Louisa C. Moats at the for-profit Sopris West, and Sharon Vaughn at the University of Texas at Austin. Vaughn was the other member of the Voyager Passport design team, and one of the four chairmen of the secretary's Reading Leadership Academy, which exerted enormous influence over Reading First; the others were Moats, Kame'enui and his Oregon colleague Douglas Carnine. States such as Alabama, North Carolina and Washington specified in their Reading First grants that every one of their reviewers for local proposals would have to be approved by one of those chairmen.

Kame'enui and Simmons also wrote the "Consumer's Guide" that most states agreed to use to evaluate Reading First programs, and ran one of Reading First's three "technical assistance centers" at Oregon. They co-wrote one Reading First textbook, and Kame'enui earned more than $100,000 last year from royalties on another, according to his financial disclosure when he moved to an Education Department job. In her 2004 book "In Defense of Our Children: When Politics, Profit, and Education Collide," Elaine Garan recalled color-coding the various financial connections running through Reading First; when it came to Kame'enui, she wrote, "I ran out of colors."

The department declined a request to interview Kame'enui, but Undersecretary Henry Johnson said the department takes conflicts of interest seriously, and will adopt all the inspector general's recommendations. "We're going to dig into this," he said.

But Johnson said states are ultimately responsible for making sure their programs are scientifically based, which is small comfort for applicants pressured into adopting programs they didn't want. "It's been very frustrating for those of us who really believe in evidence-based programs," said Richard Long, a lobbyist for the International Reading Association, which represents 90,000 reading teachers and specialists nationwide.

Then again, Long thinks spending $1 billion a year on reading is a great idea. And he thinks it's helping kids to read: "Have there been mistakes in implementation? Oh yeah. But teachers in Reading First schools believe progress is being made."

The bottom line, Johnson said, is that Reading First works. A department report found that teachers in Reading First schools spent 19 minutes more per day on reading than teachers in other schools, and were more likely to place struggling students in reading intervention programs. A new report by the nonpartisan Center on Education Policy suggested that Reading First is having a positive effect on state reading scores, although Johnson said much more needs to be done.

"Despite all the problems with Reading First, there's evidence that it's helping states," said Jack Jennings, the center's president.

Of course, $5 billion over five years ought to help states; the question is whether it's helping as much as it should. Without the kind of rigorous studies the law promised but the implementers failed to deliver, it's not clear.

But it is clear that Reading First has been a terrific boon for the textbook publishing industry, and for the department's favored programs. For example, the company that developed Voyager Passport was valued at about $5 million in a newspaper article before Reading First; founder Randy Best, whose Republican fundraising made him a Bush Pioneer, eventually sold it for $380 million. He then put Lyon and Paige on his payroll.

Local domination of education is an American tradition, and Bush took up a storied cause in challenging it; reformers since Horace Mann have promoted national education policy as a way to encourage common culture and equal opportunity. But local-control advocates have always warned that empowering heavy-handed federal bureaucrats would breed self-serving, one-size-fits-all solutions. Now, Reading First is making them look like prophets.

grunwaldmr@washpost.com

Michael Grunwald is a

Washington Post staff writer.

</body>

**LOAD-DATE:** October 1, 2006

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newspaper

Copyright 2006 The Washington Post

**EXHIBIT D**

1 of 1 DOCUMENT

The New York Times

September 23, 2006 Saturday
Late Edition - Final

# Report Says Education Officials Violated Rules in Awarding Initiative Grants

**BYLINE:** By SAM DILLON

**SECTION:** Section A; Column 1; National Desk; Pg. 8

**LENGTH:** 902 words

Department of Education officials violated conflict of interest rules when awarding grants to states under President Bush's billion-dollar reading initiative, and steered contracts to favored textbook publishers, the department's inspector general said yesterday.

In a searing report that concludes the first in a series of investigations into complaints of political favoritism in the reading initiative, known as Reading First, the report said officials improperly selected the members of review panels that awarded large grants to states, often failing to detect conflicts of interest. The money was used to buy reading textbooks and curriculum for public schools nationwide.

States have received more than $4.8 billion in Reading First grants during the Bush administration, and a recent survey by an independent group, the Center on Education Policy, reported that many state officials consider the initiative to be highly effective in raising reading achievement. But the report describes a tangled process in which some states had to apply for grants as many as six times before receiving approval, with department officials scheming to stack panels with experts tied to favored publishers.

In one e-mail message cited in the report, from which the inspector general deleted some vulgarities, the director of Reading First, Chris Doherty, urged staff members to make clear to one company that it was not favored at the department.

"They are trying to crash our party and we need to beat the [expletive deleted] out of them in front of all the other would-be party crashers who are standing on the front lawn waiting to see how we welcome these dirtbags," Mr. Doherty wrote.

Mr. Doherty recently resigned from the department to "return to the private sector," Katherine McLane, a department spokeswoman said.

Officials relayed reporters' requests for comment to Mr. Doherty, and he declined to be interviewed, an official said.

The abuses described in the report occurred during 2002 and 2003, when Rod Paige was education secretary. John Grimaldi, spokesman for the Chartwell Education Group where Mr. Paige is chairman, said he had not read the report but would seek Mr. Paige's reaction to it.

"Some of the actions taken by department officials and described in the inspector general's report reflect individual mistakes," Secretary Margaret Spellings said in a statement. "Although these events occurred before I became secretary of education, I am concerned about these actions and committed to addressing and resolving them."

Officials will review by the end of the year all Reading First applications that the department approved, to determine that they met all applicable requirements, Ms. McLane said.

The report recounts how during the formation of a review panel in 2002 a journalist asked the department whether federal officials were trying to stack the panel so that some reading programs would not be treated fairly.

The report cited the Reading First director's response to the department employee who relayed the journalist's question: "Stack the panel? I have never heard of such a thing .<harumph, harumph>" the director replied.

"The response," the report concluded, "suggests that he may indeed have intended to 'stack' the expert review panel."

The report mentions Reid Lyon, the former chief of a branch of the National Institutes of Health, who was a research adviser to President Bush and an architect of Reading First. He exerted immense influence at the department when Mr. Paige was there.

In 2002, Dr. Lyon told the Reading First director and other department officials that a woman whom the department had already selected to be on a review panel had been "actively working to undermine" a reading initiative he favored, the report said.

"Chances are that other reviewers can trump any bias on her part," Dr. Lyon told the officials.

"We can't uninvite her," a senior adviser to Mr. Paige wrote in response, the report said. "Just make sure she is on a panel with one of our barracuda types."

The incident demonstrated "the intention of the former senior adviser to the secretary to control another panelist," the report said.

In an interview yesterday, Dr. Lyon said that in the 2002 incident he sought to neutralize bias.

"If we detected bias, we had to make sure that the review panel was put together so that that bias would be neutralized," he said.

Dr. Lyon left the national institutes in August 2005 and is now an executive vice president for Higher Ed Holdings, a company based in Dallas that is working to found a college of education.

"Oh man, I'm mortified," Dr. Lyon said of the report. "To see the facts that were presented today was very disappointing, because it's an outstanding program."

The investigation was opened last year after the inspector general received accusations of mismanagement and other abuses at the department from publishers of several reading programs, including Robert E. Slavin, a director of a research center at the Johns Hopkins University who is chairman of Success for All, a nonprofit foundation that produces reading materials.

"The department has said at least 10,000 times that they had no favored reading programs, and this report provides clear evidence that they were very aggressively pressing districts to use certain programs and not use others," Dr. Slavin said.

**URL:** http://www.nytimes.com

**LOAD-DATE:** September 23, 2006

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newspaper

Copyright 2006 The New York Times Company

**EXHIBIT E**

# ED.gov

🖨 Print                                        ✂Close Window

## Statement from Secretary Spellings on the Inspector General's Report

**FOR RELEASE:**                                                    **Contact:** Public Affairs
September 22, 2006                                                            (202) 401-1576

U.S. Secretary of Education Margaret Spellings today released the following statement in regard to *The Reading First Program's Grant Application Process*, a report by the Department of Education's Office of the Inspector General.

   "Reading First is one of the best tools we have to achieve the goal of the No Child Left Behind Act of every student in America reading at grade level by 2014. While the Reading First program is still in its early years, I am greatly encouraged by its success in helping students achieve gains in literacy all over this nation. Thanks to Reading First, struggling students are far more likely to get the help they need from teachers using scientifically-based classroom reading instruction."

   "I am deeply committed to the highest levels of integrity and ethics for the Department of Education and all its programs. Some of the actions taken by Department officials and described in the Inspector General's report reflect individual mistakes. Although these events occurred before I became Secretary of Education, I am concerned about these actions and committed to addressing and resolving them. I am therefore moving swiftly to enact all of the Inspector General's recommendations."

   "I remain convinced that the Reading First program has been helpful in ensuring that reading achievement has dramatically improved in the nation's highest-need schools."

To view the Inspector General's report, please visit: http://www.ed.gov/about/offices/list/oig/whatsnew.html

                                         ###

Top

≫ **Back to September 2006**

🖨 Print                                        ✂Close Window

                              Last Modified: 09/22/2006

**EXHIBIT F**

**Dan Roth**

---

| | |
|---|---|
| **From:** | Dan Roth |
| **Sent:** | Friday, November 03, 2006 9:47 AM |
| **To:** | 'joseph.conaty@ed.gov' |
| **Subject:** | FACA status of Reading First grant review panels |

Hello Joe,

As you requested in our brief phone conversation a moment ago, I am emailing my questions about the Reading First program. Does the Department of Education consider the Reading First grant review panels (created under 20 U.S.C § 6363(2)) "advisory committees" for purposes of the Federal Advisory Committee Act? And, if so, where can I find the information disclosed under FACA?

Thank you for your time,
Dan Roth
Counsel
CREW - Citizens for Responsibility and Ethics in Washington
www.citizensforethics.org
202-408-5565 ext. 109

**EXHIBIT G**

# CREW | citizens for responsibility and ethics in washington

Margaret Spellings
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

November 6, 2006

Dear Secretary Spellings,

Citizens for Responsibility and Ethics in Washington ("CREW") respectfully requests that the Department of Education disclose all records of the proceedings of the expert review panels created to review state grant applications submitted pursuant to the Reading First program of the No Child Left Behind Act of 2001.

As you know, a September 2006 report by the Department of Education's Office of the Inspector General ("IG Report") found numerous violations of both the letter and spirit of various provisions of the No Child Left Behind Act of 2001 ("NCLB"), as well as certain federal regulations, in the administration of the Reading First grant program. In a September 22, 2006 statement, you acknowledged that mistakes had been made prior to your tenure as Secretary and expressed a commitment to swiftly correct those highlighted in the IG Report.

As reported by the media and documented by the Inspector General, the advisory panels that were created to evaluate state reading programs and advise the Secretary of Education whether or not to provide those states with Reading First grants: 1) were not constituted in compliance with NCLB; 2) granted some state programs funds without the appropriate documentation; 3) imposed evaluation criteria that were not addressed in NCLB; and 4) were composed and managed in a manner contrary to federal government standards. Additionally, the Inspector General reported that the Department set up an ineffective conflict of interest screening process and failed to follow its own peer review guidance.

Under the Federal Advisory Committee Act ("FACA"), any "committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . which is (A) established by statute . . . or . . . (C) established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for . . . one or more agencies or officers of the Federal Government," is an "advisory committee" for purposes of the Act. See 5 U.S.C. app. § 3(2). The provisions of the FACA apply to all advisory committees unless the statute creating the committee specifically provides otherwise. 5 U.S.C. app. § 4(a).

The panels established to evaluate Reading First grants clearly fall within the FACA. NCLB requires the Secretary of Education to convene a panel of experts to evaluate state educational grant applications for Reading First funds. 20 U.S.C. §§ 6363(2)(A)-(B). The review panel "shall recommend grant applications from state educational agencies . . . to the Secretary for funding or for disapproval." 20 U.S.C. § 6363(2)(C). From this panel of twelve or more experts, the Department created five-member subpanels to review the applications and make recommendations. See IG Report at 6. (The panel and subpanels are hereinafter referred to collectively as "advisory panels.")

Thus, these provisions of NCLB, and the absence of any statutory text indicating an exemption from the FACA, clearly establish the Reading First peer review advisory panels as FACA "advisory committees." Various published reports, including the IG report, indicate that panel membership was not limited to full-time or permanent part-time federal government officers, which would create an exemption from the FACA under 5 U.S.C. app. § 3(2)(C)(I).

As a federal advisory committee under the FACA, each panel convened subject to the Reading First provisions of NCLB is subject to rigorous record-keeping and disclosure provisions. See, e.g., 5 U.S.C. app. §§ 10-14. CREW requests that the Department provide records of the activities of any and all advisory committees created pursuant to the Reading First provisions of NCLB, as follows:[1]

    1)    The charter of all Reading First advisory committees, created pursuant to 5 U.S.C. app. § 9(c)(2).

    2)    Subject to the provisions of the Freedom of Information Act, 5 U.S.C. § 552, all "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee," as mandated by 5 U.S.C. app. § 10(b).

    3)(a)    Detailed meeting minutes containing "a record of the persons present, a complete and accurate description of the matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the advisory committee," and a signed certification of the accuracy of the minutes, as mandated by 5 U.S.C. app. § 10(c).

    (b)    If all or part of the minutes of any meeting are not disclosed under 5 U.S.C. app.

---

[1] As the U.S. Court of Appeals for the D.C. Circuit made clear, a party requesting information under the FACA may request information directly under § 10(b), and is not subject to the procedural strictures of a Freedom of Information Act request. See Food Chemical News v. Dep't of Health and Human Services, 980 F.2d 1468, 1472 (D.C. Cir. 1992) ("section 10(b) affirmatively obligates the Government to provide access to identified materials, regardless of whether a FOIA request has been filed.").

-2-

§ 10(c), either a written determination by the President or Secretary of Education, including reasons for non-disclosure, must be produced pursuant to 5 U.S.C. app. § 10(d).

4)   Pursuant to 5 U.S.C. app. § 11, transcripts of any "agency proceedings" (defined by 5 U.S.C. § 551 as "rulemaking, adjudication, and licensing") that took place within the advisory committee(s).

"Congress passed FACA to open the advisory committee process to the public to prevent 'subjective influences not in the public interest' from controlling meetings." <u>Food Chemical News</u>, 980 F.2d at 1472, <u>citing</u> S. Rep. No. 92-19098, 92nd Cong., 2d Sess. 6 (D.C. Cir. 1972). The misconduct identified by the Inspector General, and acknowledged by your office, indicates that just such undue influence was at play in the administration of Reading First grants over a period of several years.

The facts suggest that the Department of Education has failed to comply with the FACA. Should the Department continue to disregard the law, CREW will have no choice but to take further legal action. To that end, we respectfully request a response within twenty days.

Thank you for your attention to this matter.

Sincerely,

Melanie Sloan
Executive Director

-3-

CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Citizens for Responsibility and Ethics in Washington | Margaret Spellings; U.S Department of Education |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    11001
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    11001
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Anne L. Weismann
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C. 20005
202-408-5565

CASE NUMBER   1:06CV02086

JUDGE: Henry H. Kennedy

DECK TYPE: General Civil

DATE STAMP: 12/07/2006

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES**
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/* *2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA* *(non-employment)* | ○ **L.** *Other Civil Rights* *(non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

5 U.S.C. App. §§ 1, et. seq. (FACA); U.S. Department of Education has failed to produce records requested by plaintiff pursuant to FACA.

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____ Check YES only if demanded in complaint

JURY DEMAND:    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE 12/07/2006    SIGNATURE OF ATTORNEY OF RECORD _____

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.