# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
CITIZENS FOR RESPONSIBILITY AND          :
ETHICS IN WASHINGTON                     :
                                         :
   Plaintiff,             :
                                         :
  v.                           : Civil Action No. 1:06cv02086 (HHK)
                                         :
MARGARET SPELLINGS, et al.,              :
                                         :
   Defendants.             :
_____:

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
## FOR A STAY OF PROCEEDINGS

### STATEMENT

  Over three months ago, on December 7, 2006, plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") filed this action against Margaret Spellings, Secretary of the U.S. Department of Education ("DOED") and DOED, seeking to compel the defendants to comply with the Federal Advisory Committee Act ("FACA") in their administration of the Reading First Program. Plaintiff's suit was motivated by defendants' flagrant and continuing violations of the FACA that resulted in serious abuses, as documented in six different Inspector General ("IG") reports. To remedy these violations of law, CREW seeks declaratory and injunctive relief.

  In response to the lawsuit, DOED initiated settlement discussions seemingly predicated on a concession that the agency had violated the FACA. As long as the parties were negotiating in good faith CREW agreed to extend defendants' time to answer the complaint until March 14, 2007. Ultimately those discussions were not fruitful, as DOED agreed only to produce a narrow subset of the documents to which CREW is legally entitled under the FACA, refused to give

CREW adequate assurances that the latest advisory panel it was planning to set up would comply fully with the FACA, and refused to address the injunctive relief CREW is seeking.

At this point, rather than answer or otherwise respond to the complaint as they are legally required to do, defendants filed a rather extraordinary motion captioned as a motion to stay proceedings until June 29, 2007, to "permit defendants *to attempt to moot this action* . . ." Defendants' Motion for a Stay of Proceedings and Memorandum in Support Thereof ("Ds' Mem."), p. 1 (emphasis added).  In reality, defendants' motion is an attempt to prematurely raise legal claims under the guise of a non-substantive stay motion and to avoid answering the complaint, presumably because DOED recognizes that it cannot properly deny facts that lead to the inescapable conclusion that the agency violated FACA's mandates.  Moreover, defendants' stay motion is no substitute for the "responsive pleading" or motion required by Rule 12(b) of the Federal Rules of Civil Procedure.

Under these circumstances defendants' motion must be denied.  First, to grant the stay motion the Court would have to reach the merits of what is actually a legal claim that once DOED produces four relatively narrow subsets of documents this case will be moot. Defendants' stay motion, however, does not properly put this claim at issue, nor could it since, as defendants concede, the case is not moot as defendants have yet to produce a single document. There is simply no basis for this Court to address a legal claim about the sufficiency of defendants' proposed remedy made under the guise of a stay request without any supporting factual record.

Under the terms of the FACA plaintiff and the public are entitled to "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents

which were made available to or prepared for or by each advisory committee . . ."  5 U.S.C. App.

§ 10(b).  Defendants' proposal does not satisfy this mandate.  Nor have the defendants offered

sufficient assurances that, on an ongoing basis, the advice and recommendations of any advisory

committee the agency establishes or uses "will not be inappropriately influenced by the

appointing authority or by any special interest . . ."  Id. at §§ 5(b)(3), 5(c).  And, most critically,

DOED has failed to give even the most basic assurance that in further implementing the Reading

First Program, it will comply fully with the FACA.

      Finally, granting a stay now will pervert rather than serve the interests of justice.  To

date, under the auspices of the Reading First Program, DOED has paid out to states nearly $6

billion to fund reading initiatives for our nation's most at-risk children.  As DOED's IG has

documented, however, the program has been plagued overwhelmingly by conflicts of interest

and serious mismanagement that were compounded by the fact that, despite the FACA's

requirements to the contrary, the application, evaluation and funding recommendation processes

were conducted in secret.  The paltry relief to which DOED has committed here in the interest of

making the litigation go away will not adequately redress DOED's serious wrongs or give the

public sufficient confidence that public funds are being properly directed to help children learn

to read.

## BACKGROUND

### The Federal Advisory Committee Act

      The FACA imposes a number of requirements on committees that are established or

utilized by the president or federal agencies to obtain advice or recommendations ("advisory

committees").  5 U.S.C. App. §§ 2 et. seq.  The FACA defines "advisory committee" in relevant

part to include any "committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . which is (A) established by statute . . . or . . . (C) established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for . . . one or more agencies or officers of the Federal Government." 5 U.S.C. App. § 3(2). Advisory committees that meet this definition are subject to the FACA's requirements unless specifically exempted by statute, id. at § 4, or unless all of the committee members are full-time or permanent part-time government officers or employees. Id. at § 3(2)(C)(i).

Before taking any action each advisory committee subject to the FACA must file a charter setting forth the committee's objective, activities, and duties. Id. at § 9(c)(2). In addition, the agency establishing an advisory committee must ensure "the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." Id. at §§ 5(b)(3), 5(c). Congress also mandated that membership in advisory committees be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." Id. at § 5(b).

The FACA also requires advisory committees to provide advance notice of any meetings and open their meetings to the public, id. at § 10(a), unless the agency head determines that the meeting may be closed to the public in accordance with the Government in the Sunshine Act, 5 U.S.C. § 552(b)(c). 5 U.S.C. App. § 10(d). All meetings must be chaired or attended by an officer or employee of the federal government authorized to adjourn any meeting when he or she deems adjournment in the public interest. Id. at § 10(e).

4

In addition, under the FACA advisory committees must make available for public inspection all "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee," to the extent they are not subject to one of the exemptions in the Freedom of Information Act.  Id. at § 10(b); Food Chemical News v. U.S. Dep't of Health and Human Services, 980 F.2d 1469, 1472-73 (D.C. Cir. 1992).  Advisory committees must keep and disclose detailed meeting minutes for every meeting that include "a record of the persons present, a complete and accurate description of the matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the advisory committee," along with a signed certification of the minutes.  5 U.S.C. App. § 10(c).  If an advisory committee does not disclose all or part of the minutes of any meeting, it must produce a written determination by the agency head that includes reasons for the non-disclosure.  Id. at § 10(d).

### The Reading First Initiative

On January 8, 2002, through the No Child Left Behind Act, Congress enacted the Reading First Initiative as an amendment to the Elementary and Secondary Education Act of 1965, 20 U.S.C. §§ 7801 et seq. ("ESEA").  See 20 U.S.C. § 6362.  The purpose of the initiative was "[t]o provide assistance to State educational agencies and local educational agencies in establishing reading programs . . . that are based on scientifically based reading research."  20 U.S.C. § 6361(1).

The legislation required the Secretary of Education to create a panel to evaluate state Reading First grant proposals and recommend to the Secretary whether or not to approve funding.  Id. at § 6363(c).  The statute specified that the panel was, "at a minimum" to "include

three individuals selected by the Secretary, three individuals selected by NIFL [National Institute for Literacy], three individuals selected by the National Research Council of the National Academy of Sciences and three individuals selected by the National Institute of Child Health and Human Development." Id.

In response, DOED established an expert review panel with the statutorily mandated composition, but then transferred the entire work of the panel to 16 subpanels of five panelists each. Final Inspection Report of the Department of Education's Office of Inspector General, ED-OIG/113-F0017 (September 2006) ("Sept. 2006 IG Report") (attached as Exhibit A to Complaint). The membership in the subpanels did not comport with the statutory requirements, nor was it guided by scientifically-based procedures as the ESEA requires. Id. at 1-2. Of the 16 subpanels, 15 had a majority of agency-selected panelists and seven were selected entirely by DOED. Id. at 6. Moreover, "[n]one of the subpanels included a representative from each of the nominating organizations . . ." Id. In addition, the advisory panels made state grants without appropriate documentation, imposed evaluation criteria not included in the ESEA, and were composed and managed in contravention of Government Accountability Office management standards. See generally Sept. 2006 IG Report. And DOED did not have an effective conflict-of-interest screening process and failed to follow its own peer review guidance. Id. at 1.

Based on concerns that the use of the subpanels would not comply with the statutory mandates, high-level DOED officials recommended that the agency create a 12-member Advisory and Oversight Panel, consisting of individuals selected by the four entities named in the statute, to examine the work of the subpanels. Id. at 6. This recommendation was ignored. Id. at 6-7.

None of the Reading First advisory panels was conducted in compliance with the FACA. Specifically, the membership of the panels was anything but "fairly balanced" and they were not conducted in compliance with the public disclosure and open meeting provisions of the FACA. Moreover, DOED ignored CREW's multiple requests for documents made prior to filing this lawsuit, Complaint at ¶¶ 27-28, despite Secretary Spelling's public commitment to address and resolve the prior mistakes of the agency in administering the Reading First Initiative.  Id. at ¶ 26.

## **ARGUMENT**

### **I.  DEFENDANT'S MOTION TO STAY HAS NO BASIS IN LAW OR FACT.**

As the Supreme Court has made clear, a court's power to stay an action "is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. N. America Co., 299 U.S. 248, 254 (1936).  In exercising its judgment and discretion as to whether a stay is warranted, the court should "weigh competing interests and maintain an even balance." Id.  The party requesting a stay must, in the first instance, "make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." Id.

Defendants seek to have this Court stay all action in this case until June 29, 2007, to give them an opportunity to "attempt to moot this action."  Ds' Mem. at 1.  They do not claim any hardship in going forward with the litigation and ignore completely the fact that a stay will harm the interests of CREW and the public.

Moreover, defendants seek a stay in the complete absence of any factual record to support their claim that by the end of June the lawsuit will be moot.  Defendants have not even

answered the complaint, despite the February 12, 2007 order of the Court requiring them to do so by March 14, 2007.[1]  Thus, defendants have not put at issue any of the facts or legal claims set forth in the complaint, which the Court must now accept as uncontested.

Nor have defendants come forward with any factual or legal support for their stay motion.  Defendants claim that when they release four subsets of documents they will have satisfied fully their obligations under the FACA.  Specifically, defendants propose releasing:  (1) preliminary and final versions of Reading First applications submitted by state educational agencies ("SEA"s); (2) Reading First criteria for reviewing state applications that DOED provided to peer reviewers; (3) technical review summary forms of individual panelists; and (4) panel chair summary forms for all applications submitted by SEAs.  Ds' Mem. at 3-4.

Completely absent from their motion, however, is any explanation or substantiation as to why these are the only categories of documents to which CREW and the public are legally entitled.  For example, defendants have not demonstrated that the narrow subset of documents they are willing to produce constitutes all "documents which were made available to or prepared for or by" the 16 subpanels.  See 5 U.S.C. app. § 10(b).  There is no evidence whatsoever before the Court about the universe of documents  made available to or prepared by the panels.

In addition, under the FACA CREW is entitled to a much broader range of documents including, but not limited to, "working papers, drafts, studies . . . or other documents which were

_____

[1] Pursuant to Rule 12 of the Federal Rules of Civil Procedure defendants were required to file either an answer or responsive pleading within 60 days of the filing of the complaint or within such other time period as ordered by the Court.  Rule 12(b) permits a defendant to plead certain defenses by motion before filing a responsive pleading.  Defendants here did not comply with either of these provisions -- they have yet to file an answer or responsive pleading, nor have they filed a motion authorized by Rule 12(b)(1)-(7).

made available to or prepared for or by each advisory committee . . ." 5 U.S.C. App. § 10(b).

As applied here, those documents would include:

>(1) all criteria and guidelines used to evaluate state funding applications, not just those DOED provided to peer reviewers;

>(2) any documentation reflecting informal criteria actually used at any level of Reading First panels to evaluate reading programs or make funding decisions;

>(3) any comments of individual panelists regarding SEA applications, including suggested clarifications or changes to those applications;

>(4) all funding recommendations from panels and panelists, not just those included in summary sheets and panel chair summary forms;

>(5) all technical review forms filled out by panelists when evaluating SEA applications, not just those included in technical review form summary sheets;

>(6) all expert review team reports;

>(7) drafts and final versions of all items in SEA packages, including applications, Reading First criteria and Reading First guidance, to the extent not included in SEA applications;

>(8) all records relating to the proposed creation of the Advisory and Oversight Panel;

>(9) all records regarding conflict-of-interest screening for panelists; and

>(10) all records and notes of meetings of the Reading First panelists, including notes of individual panelists.

Defendants do not even attempt to argue or explain why they need not produce any of these

categories of documents.[2]  Given that the much narrower subset of documents defendants have

promised to provide does not come close to satisfying their obligations under the FACA, their

---

[2] CREW requested these additional documents in correspondence with defendants. Rather than produce these documents, defendants terminated settlement discussions and filed a stay motion in lieu of the required answer.

9

stay request which is premised in large part on that promise must be denied.

Defendants' stay request is also premised on their claim that Secretary Spellings, by announcing in the Federal Register her intention to establish a new Reading First panel to be governed by the FACA, has mooted any other relief to which plaintiff is entitled. Ds' Mem. at 2-3. The Federal Register notice published on March 1, 2007, announces the Secretary's intention to establish under the FACA an advisory committee to evaluate the one remaining state application for funding not yet acted upon as well as third-year progress reports states were required to submit to DOED on or before November 30, 2006. See 72 Fed. Reg. 9,300 (March 1, 2007).

This notice, however, does not even begin to address the very serious FACA violations committed by the defendants in their implementation to date of the Reading First Initiative. Plaintiff has sought injunctive relief here to remedy violations that defendants have not even contested under Rule 12. At a bare minimum, plaintiff is entitled to be heard on this issue. Equally as troubling, defendants have refused to commit to CREW that they will not, as they did in the past, transfer the work of the new advisory committee to subpanels to avoid complying with the FACA. Indeed, defendants have given neither plaintiff nor the Court any assurances whatsoever that, notwithstanding their flagrant, intentional, and continuing violations of the FACA, they will comply fully with the statute from this point forward. It is for these reasons that plaintiff continues to seek declaratory and injunctive relief -- relief that is not satisfied by the proposal set forth in defendants' stay motion.

In short, there is no basis in law or fact to grant the requested stay. Indeed, granting the stay would serve little purpose, as it would not materially advance the litigation given that

10

significant factual and legal issues would remain.[3]

## II.  GRANTING A STAY WILL NOT SERVE THE INTERESTS OF JUSTICE.

DOED's implementation of the Reading First Program is virtually the "poster child" for FACA abuse.  Operating in secret, completely lacking in balanced perspectives, plagued by blatant financial conflicts of interests and utilizing criteria that went well beyond what the statute requires, the subpanels that approved all but one state funding application were in complete derogation of their obligations under the FACA.  For example, as DOED's own Inspector General found, agency officials steered contracts to favored textbook publishers and made clear to at least one other company that "it was not favored at the department."  Sam Dillon, Report Says Education Officials Violated Rules in Awarding Initiative Grants, The New York Times (September 23, 2006) (attached as Exhibit 1); see generally Sept. 2006 IG Report.  Out of the sunshine, the advisory panels were able to administer a $6 billion program to mandate states' use of specific curriculums, in contravention of federal law.  See, e.g., Diana Jean Schemo, Federal-Local Clash in War Over Reaching Reading, The New York Times, March 9, 2007 (attached as Exhibit 2).  Defendants' track record to date is abysmal.

Just as troubling, Secretary Spellings refused to do anything about these problems until CREW brought this lawsuit.  Five months ago Secretary Spellings issued a tepid acknowledgment that "individual mistakes" were made in DOED's administration of the Reading First Program.  Press Release, U.S. Department of Education, Statement from Secretary

---

[3] Of course, the litigation can only continue if defendants meet their legal obligation to answer or otherwise properly respond to the complaint.  Absent such response, plaintiff is entitled to a default judgment pursuant to Rule 55 of the Federal Rules of Civil Procedure.  See Keegel v. Key West & Caribbean Trading Co., 627 F.2d 372, 374 n.5 (D.C. Cir. 1980) (court has power to enter default judgment when a defendant fails to defend its case appropriately).

Spellings on Inspector General's Report (September 22, 2006) (attached as Exhibit E to

Complaint).[4]  She committed to address and resolve those mistakes and "move swiftly to enact

all of the Inspector General's recommendations."  Id.  Yet Secretary Spellings ignored

completely CREW's letter of November 6, 2006, requesting that DOED provide the information

from the Reading First subpanels to which CREW is entitled under the FACA (attached as

Exhibit F to Complaint), and has still not released any documents to CREW.  Moreover,

CREW's requests for assurances that the work of any future advisory panel will not be

transferred to a non-FACA compliant panel, as DOED has done in the past, have gone

unanswered.

   This background of abuse makes it imperative that the Court consider carefully and fully

both the declaratory and injunctive relief that plaintiff has requested and on the basis of a

complete factual record.  At issue is not just the defendants' poor administration of a multi-

billion dollar program, but the opportunities for our nation's most disadvantaged children to

learn to read.

   Defendants' stay motion is an effort to sweep the agency's past mistakes under the rug

and move forward based on the most minimal of commitments from the Secretary and DOED.

Granting a stay under these circumstances will thwart, not serve the interests of justice.

### CONCLUSION

---

[4] There have been suggestions that Secretary Spellings was deeply involved in the
Reading First Program while serving as President Bush's chief domestic policy advisor.  A
former DOED official was quoted as saying that prior to becoming secretary of DOED, Ms.
Spellings "micromanaged the implementation of Reading First from her West Wing office."
Kathleen Kennedy Manzo, E-Mails Reveal Federal Reach Over Reading, *Education Week*
(February 20, 2007) (attached as Exhibit 3).

For the foregoing reasons, defendants' motion for a stay of proceedings should be denied and defendants should be ordered to answer the complaint immediately.

Respectfully submitted,


_____/s/_____
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and
 Ethics in Washington
1400 Eye St., NW, Suite 450
Washington, DC  20005
Phone: (202) 408-5565
Fax: (202) 588-5020


Attorneys for Plaintiff


March 22, 2007

**EXHIBIT 1**

10 of 10 DOCUMENTS

The New York Times

September 23, 2006 Saturday
Late Edition - Final

# Report Says Education Officials Violated Rules in Awarding Initiative Grants

**BYLINE:** By SAM DILLON

**SECTION:** Section A; Column 1; National Desk; Pg. 8

**LENGTH:** 902 words

Department of Education officials violated conflict of interest rules when awarding grants to states under President Bush's billion-dollar reading initiative, and steered contracts to favored textbook publishers, the department's inspector general said yesterday.

In a searing report that concludes the first in a series of investigations into complaints of political favoritism in the reading initiative, known as Reading First, the report said officials improperly selected the members of review panels that awarded large grants to states, often failing to detect conflicts of interest. The money was used to buy reading textbooks and curriculum for public schools nationwide.

States have received more than $4.8 billion in Reading First grants during the Bush administration, and a recent survey by an independent group, the Center on Education Policy, reported that many state officials consider the initiative to be highly effective in raising reading achievement. But the report describes a tangled process in which some states had to apply for grants as many as six times before receiving approval, with department officials scheming to stack panels with experts tied to favored publishers.

In one e-mail message cited in the report, from which the inspector general deleted some vulgarities, the director of Reading First, Chris Doherty, urged staff members to make clear to one company that it was not favored at the department.

"They are trying to crash our party and we need to beat the [expletive deleted] out of them in front of all the other would-be party crashers who are standing on the front lawn waiting to see how we welcome these dirtbags," Mr. Doherty wrote.

Mr. Doherty recently resigned from the department to "return to the private sector," Katherine McLane, a department spokeswoman said.

Officials relayed reporters' requests for comment to Mr. Doherty, and he declined to be interviewed, an official said.

The abuses described in the report occurred during 2002 and 2003, when Rod Paige was education secretary. John Grimaldi, spokesman for the Chartwell Education Group where Mr. Paige is chairman, said he had not read the report but would seek Mr. Paige's reaction to it.

"Some of the actions taken by department officials and described in the inspector general's report reflect individual mistakes," Secretary Margaret Spellings said in a statement. "Although these events occurred before I became secretary of education, I am concerned about these actions and committed to addressing and resolving them."

Officials will review by the end of the year all Reading First applications that the department approved, to determine

that they met all applicable requirements, Ms. McLane said.

The report recounts how during the formation of a review panel in 2002 a journalist asked the department whether federal officials were trying to stack the panel so that some reading programs would not be treated fairly.

The report cited the Reading First director's response to the department employee who relayed the journalist's question: "Stack the panel? I have never heard of such a thing .<harumph, harumph>" the director replied.

"The response," the report concluded, "suggests that he may indeed have intended to 'stack' the expert review panel."

The report mentions Reid Lyon, the former chief of a branch of the National Institutes of Health, who was a research adviser to President Bush and an architect of Reading First. He exerted immense influence at the department when Mr. Paige was there.

In 2002, Dr. Lyon told the Reading First director and other department officials that a woman whom the department had already selected to be on a review panel had been "actively working to undermine" a reading initiative he favored, the report said.

"Chances are that other reviewers can trump any bias on her part," Dr. Lyon told the officials.

"We can't uninvite her," a senior adviser to Mr. Paige wrote in response, the report said. "Just make sure she is on a panel with one of our barracuda types."

The incident demonstrated "the intention of the former senior adviser to the secretary to control another panelist," the report said.

In an interview yesterday, Dr. Lyon said that in the 2002 incident he sought to neutralize bias.

"If we detected bias, we had to make sure that the review panel was put together so that that bias would be neutralized," he said.

Dr. Lyon left the national institutes in August 2005 and is now an executive vice president for Higher Ed Holdings, a company based in Dallas that is working to found a college of education.

"Oh man, I'm mortified," Dr. Lyon said of the report. "To see the facts that were presented today was very disappointing, because it's an outstanding program."

The investigation was opened last year after the inspector general received accusations of mismanagement and other abuses at the department from publishers of several reading programs, including Robert E. Slavin, a director of a research center at the Johns Hopkins University who is chairman of Success for All, a nonprofit foundation that produces reading materials.

"The department has said at least 10,000 times that they had no favored reading programs, and this report provides clear evidence that they were very aggressively pressing districts to use certain programs and not use others," Dr. Slavin said.

URL: http://www.nytimes.com

LOAD-DATE: September 23, 2006

LANGUAGE: ENGLISH

PUBLICATION-TYPE: Newspaper

Copyright 2006 The New York Times Company

**EXHIBIT 2**

3 of 10 DOCUMENTS

The New York Times

March 9, 2007 Friday
Late Edition - Final

# Federal-Local Clash in War Over Teaching Reading

**BYLINE:** BY DIANA JEAN SCHEMO

**SECTION:** Section A; Column 1; National Desk; Pg. 16

**LENGTH:** 1587 words

**DATELINE:** MADISON, Wis.

Surrounded by five first graders learning to read at Hawthorne Elementary here, Stacey Hodiewicz listened as one boy struggled over a word.

"Pumpkin," ventured the boy, Parker Kuehni.

"Look at the word," the teacher suggested. Using a method known as whole language, she prompted him to consider the word's size. "Is it long enough to be pumpkin?"

Parker looked again. "Pea," he said, correctly.

Call it the $2 million reading lesson.

By sticking to its teaching approach, that is the amount Madison passed up under Reading First, the Bush administration's ambitious effort to turn the nation's poor children into skilled readers by the third grade.

The program, which gives $1 billion a year in grants to states, was supposed to end the so-called reading wars -- the battle over the best method of teaching reading -- but has instead opened a new and bitter front in the fight.

According to interviews with school officials and a string of federal audits and e-mail messages made public in recent months, federal officials and contractors used the program to pressure schools to adopt approaches that emphasize phonics, focusing on the mechanics of sounding out syllables, and to discard methods drawn from whole language that play down these mechanics and use cues like pictures or context to teach.

Federal officials who ran Reading First maintain that only curriculums including regular, systematic phonics lessons had the backing of "scientifically based reading research" required by the program.

But in a string of blistering reports, the Education Department's inspector general has found that federal officials may have violated prohibitions in the law against mandating, or even endorsing, specific curriculums. The reports also found that federal officials overlooked conflicts of interest among the contractors that advised states applying for grants, and that in some instances, these contractors wrote reading programs competing for the money, and stood to collect royalties if their programs were chosen.

Education Secretary Margaret Spellings has said that the problems in Reading First occurred largely before she took over in 2005, and that her office has new guidelines for awarding grants. She declined a request for an interview.

Madison officials say that a year after Wisconsin joined Reading First, in 2004, contractors pressured them to drop their approach, which blends some phonics with whole language in a program called Balanced Literacy. Instead, they gave up the money -- about $2 million, according to officials here, who say their program raised reading scores.

In New York City, under pressure from federal officials, school authorities in 2004 dropped their citywide balanced literacy approach for a more structured program stronger in phonics, in 49 low-income schools. At stake was $34 million.

Across the country -- in Illinois, Kentucky, Massachusetts, Maine and New Jersey -- schools and districts with programs that did not stress phonics were either rejected for grants or pressured to change their methods even though some argued, as Madison did, that their programs met the law's standard.

"We had data demonstrating that our children were learning at the rate that Reading First was aiming for, and they could not produce a single ounce of data to show the success rates of the program they were proposing," said Art Rainwater, Madison's superintendent of schools.

Robert Sweet Jr., a former Congressional aide who wrote much of the Reading First legislation, said the law aimed at breaking new ground by translating research into lesson plans. Under the law, the yardstick of a reading program's scientific validity became a 2000 report by the National Reading Panel.

That panel, created by Congress, with members selected by G. Reid Lyon, a former head of a branch of the National Institutes of Health, set out to review the research and tell Americans what worked. It named phonics and related skills, vocabulary, fluency and reading comprehension as the cornerstones of effective reading instruction.

Mr. Sweet firmly believes that phonics is the superior method of instruction; he is now president of the National Right to Read Foundation, a pro-phonics group. His e-mail address begins phonicsman.

With Reading First, he said, "we felt we could put education on a new path."

Dr. Lyon, another architect of the legislation, also strongly favors phonics. Teaching children to read by reason and context, as Parker did in Madison, rather than by sounding out letters to make words, is anathema, he said in an interview, suggesting that teachers of the whole language approach be prosecuted for "educational malpractice."

Mr. Sweet agreed. "You've got billions used for the purchase of programs that have no validity or evidence that they work, and in fact they don't, because you have so many kids coming out of the schools that can't read," he said.

But educators in Madison and elsewhere disagree about the effectiveness of phonics, and say their results prove their method works.

Under their system, the share of third graders reading at the top two levels, proficient and advanced, had risen to 82 percent by 2004, from 59 percent six years earlier, even as an influx of students in poverty, to 42 percent from 31 percent of Madison's enrollment, could have driven down test scores. The share of Madison's black students reading at the top levels had doubled to 64 percent in 2004 from 31 percent six years earlier.

And while 17 percent of African-Americans lacked basic reading skills when Madison started its reading effort in 1998, that number had plunged to 5 percent by 2004. The exams changed after 2004, making it impossible to compare recent results with those of 1998.

Other reading experts, like Richard Allington, past president of the International Reading Association, also challenge the case for phonics. Dr. Allington and others say the national panel's review showed only minor benefits from phonics through first grade, and no strong support for one style of instruction. They also contend that children drilled in phonics end up with poor comprehension skills when they tackle more advanced books.

"This revisionist history of what the research says is wildly popular," Dr. Allington said. "But it's the main reason why so much of the reading community has largely rejected the National Reading Panel report and this large-scale vision of what an effective reading program looks like."

Under Reading First, many were encouraged to use a pamphlet, "A Consumer's Guide to Evaluating a Core Reading Program Grades K-3," written by two special education professors, then at the University of Oregon, to gauge whether a

program was backed by research.

But the guide also rewards practices, like using thin texts of limited vocabulary to practice syllables, for which there is no backing in research. Dr. Allington said the central role Washington assigned the guide effectively blocked from approval all but a few reading programs based on "made-up criteria."

Deborah C. Simmons, who helped write the guide, said it largely reflected the available research, but acknowledged that even now, no studies have tested whether children learn to read faster or better through programs that rated highly in the guide.

Fatally for Madison, the guide does not consider consistent gains in reading achievement alone sufficient proof of a program's worth.

In making their case, city officials turned to Kathryn Howe of the Reading First technical assistance center at the University of Oregon, one of several nationwide paid by the federal Education Department that helped states apply for grants. But early on, they began to suspect that Dr. Howe wanted them to dump their program.

At a workshop, she showed them how the guide valued exposing all children to identical instruction in phonics. Madison's program is based on tailoring strategies individually, with less emphasis on drilling.

Dr. Howe used the Houghton Mifflin program as a model; officials here believed that approval would be certain if only they switched to that program, they said.

In interviews, Dr. Howe said she had not meant to endorse the Houghton Mifflin program and used it only for illustration, and had no ties to the company. She added that she might have been misunderstood.

"I certainly didn't say, 'You should buy Houghton Mifflin,' " she said. "I do remember saying: 'You can do this without buying a purchased program. It's easier if you have a purchased program, so you might think about that.' "

Mary Watson Peterson, Madison's reading chief, said intensive phonics was used for struggling children.

After providing Dr. Howe extensive documentation, Madison officials received a letter from her and the center's director, saying that because the city's program lacked uniformity and relied too much on teacher judgment, they could not vouch to Washington that its approach was grounded in research.

Ultimately Madison withdrew from Reading First, said Mr. Rainwater, the superintendent, because educators here grew convinced that approval would never come. "It really boiled down to, we were going to have to abandon our reading program," the superintendent said.

A subsequent letter from Dr. Howe seemed to confirm his view. "Madison made a good decision" in withdrawing, she wrote, "since Reading First is a very prescriptive program that does not match your district's reading program as it stands now."

**URL:** http://www.nytimes.com

**LOAD-DATE:** March 9, 2007

**LANGUAGE:** ENGLISH

**GRAPHIC:** Photos: Santiago Lavenant, a second grader at Hawthorne Elementary in Madison, Wis., where officials withdrew from a federal reading program.
Humboldt Park Elementary in Milwaukee teaches phonics. (Photographs by Darren Hauck for The New York Times)

**PUBLICATION-TYPE:** Newspaper

Copyright 2007 The New York Times Company

# EXHIBIT 3

# EDUCATION WEEK

Published: February 21, 2007

# E-Mails Reveal Federal Reach Over Reading

**Communications show pattern of meddling in 'Reading First.'**

By Kathleen Kennedy Manzo



The Reading First initiative's rigorous requirements have earned it a reputation as the most prescriptive federal grant program in education. Now, an *Education Week* review of hundreds of e-mail exchanges details a pattern of federal interference that skirted legal prohibitions.

In the midst of carrying out the $1 billion-a-year program, which is part of the No Child Left Behind Act, federal officials:

• Worked to undermine the literacy plan of the nation's largest school system;

• Pressured several states to reject certain reading programs and assessments that were initially approved under their Reading First plans;

• Rallied influential politicians, political advisers, and appointees to ensure that state schools chiefs stayed on track with program mandates; and

• Pressed one state superintendent to withdraw grant funding from a district that demoted a principal in a participating school.

In regular e-mail discussions, Christopher J. Doherty, the Reading First director at the U.S. Department of Education until last September, and G. Reid Lyon, a branch chief at the National Institute of Child Health and Human Development until June 2005 and an influential adviser to the initiative, closely monitored states' progress in applying for Reading First money, in issuing subgrants to districts, and in complying with the law's provisions for scientifically based instruction. They also worked out strategies for intervening where they deemed more federal control was warranted.

"We ding people all the time in Reading First," Mr. Doherty wrote in March 2005, after he pressured Illinois education leaders to pull funding from a district. "We don't like to do it, of course, but we do it because otherwise RF turns to crap and means nothing, just another funding stream to do whatever it is you were going to do anyway."

Some former federal officials and supporters of the program argue that such oversight was essential to its success, but a number of state and local officials took offense and questioned whether Reading First staff members exceeded their authority. Some policy experts say they came close to doing so.

"That's an unprecedented level of interference," said Christopher T. Cross, a policy consultant for Cross & Joftus LLC in Danville, Calif. Mr. Cross helped write the ban against federal intervention in curriculum and instruction into the Elementary and Secondary Education Act in the 1970s and later

served as an assistant secretary in the Education Department under President George H.W. Bush.

The language was left in when the law was reauthorized as the No Child Left Behind Act in 2001. It states that federal employees are prohibited from exercising "any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system."

"The intention when that language was put into the statute," Mr. Cross said, "was that these were decisions that had to be made at the local level in connection with local standards. I think there's no question what went on [in Reading First] is right on the border of crossing the line on that provision."

### Showdown in Rockford

A highly critical report issued by the Education Department's inspector general last fall concluded that federal officials may have overstepped their authority in crafting the strict requirements. Inspector General John P. Higgins Jr. also said those officials seemed to favor a particular instructional method while discrediting others. ("**Scathing Report Casts Cloud Over 'Reading First**,'" Oct. 4, 2006.)

The crass and sometimes vulgar e-mail exchanges that underpinned the inspector general's findings stunned many educators and policymakers. The findings led to a shakeup in the department's Reading First office.

But advocates of the program, and allies of Mr. Doherty, protested that the report was overblown and had unfairly selected sensational e-mails to paint a dedicated and effective employee as a rogue operator within the department. The e-mail record, however, shows Mr. Doherty's aggressive and arrogant tone repeated in messages to Mr. Lyon and other colleagues.

The e-mails were obtained by *Education Week* and a complainant in a case against the Department of Education through the Freedom of Information Act.

Some state and local officials said they felt bullied by Mr. Doherty. One such case played out in Rockford, Ill., in early 2005, after federal officials received e-mail messages about a principal at a Reading First school there. The principal was reassigned after battling with district officials over reading instruction at Lewis Lemon Elementary School. The new superintendent, Dennis Thompson, and district director of instruction Martha Hayes wanted the school to supplement its direct-instruction model with more varied reading selections and writing activities after determining that students weren't being prepared for the more rigorous coursework of the later grades.

The principal received help from a local supporter of the National Right to Read Foundation, which promotes phonics instruction. Robert W. Sweet Jr., then an influential senior analyst with the education committee of the U.S. House of Representatives and the founder of

### E-mail Excerpts

*I am going to review all my [Indiana] files on Monday. Having done no subgrants yet, it may be hard to make something stick, but if they are trying to go soft with the requirements, they are just as good a candidate as any other state to show them/the rest that RF is NOT just another federal reading program that can be flouted.*
—Reading First Director Christopher J. Doherty to G. Reid Lyon, a branch chief for the National Institute of Child Health and Human Development, citing concerns that Indiana officials may not be taking Reading First requirements seriously enough, March 2, 2003

*Monitoring will be key as usual. They will game the system if they can. They think they have already done everything and are getting*

the NRRF, asked Mr. Lyon to look into the matter. Mr. Lyon corresponded with Mr. Doherty, a direct-instruction advocate, about the need to apply pressure to state leaders in Illinois.

In March of 2005, after numerous telephone discussions and a meeting with state schools Superintendent Randy Dunn, Mr. Doherty sent a letter to the state, expressing his dissatisfaction with Illinois' implementation of the grant. Mr. Doherty cited the Rockford case and the state's hiring of an employee for the Reading First program who he thought did not subscribe to scientifically based reading research. He informed Mr. Dunn that the state was being "designated in need of corrective action," and would be subject to additional monitoring, consequently risking the loss of millions of dollars in future grant funding.

"Clearly, there were issues of program compliance in Rockford, and we were working to address them," said Mr. Dunn, the state schools chief until last month. "But the situation with the principal there had given a great entree to the feds to start wielding a heavy hand. They took an opportunity with a situation that was kind of separate from the Reading First program to get ahold of us, the state, directly by the throat."

Mr. Thompson, the district chief, said the issue was a personnel matter, unrelated to Reading First. He said he wasn't even aware that federal officials were involved and kept apprised of the situation in Rockford until informed by *Education Week*.

Mr. Doherty and Mr. Lyon e-mailed each other repeatedly about the situation, sometimes in response to Mr. Sweet's queries. They expressed outrage at what appeared to them to be mistreatment of the principal and district officials' undermining of the direct-instruction program with "their ill-fated wrong turn to balanced literacy."

Although "balanced literacy" is viewed by many educators as an approach incorporating a variety of skills- and literature-based reading methods, it is considered code for "whole language" by Mr. Doherty and others pushing more explicit and systematic instruction.

The field of reading instruction has been marked for decades by disputes over the best approach to teaching

*the RF bucks to shine shit. How strong should I be with respect to guidance at the highest state level. I will meet with Gov. [Kathleen] Sebelius in the morning. How detailed should I be with respect to the shortcomings.*
—Mr. Lyon to Mr. Doherty regarding Kansas' Reading First program, April 16, 2003

*I have been in good, regular touch with Everett Barnes, pres. Of RMC Research Corp., which does both [Reading First Technical Assistance] and some [Comprehensive] Center work, too re: the Shaywitz report and I am very happy to learn that you find it scathing and clear in its conclusions/recommendations. Not happy that NYC is doing something this bad, of course, just glad that the report is not the usual equivocating 'On the one hand,..but on the other...' kind of stuff....this is not a 'dueling experts' kind of thing. This has the Flat Earth Society on one side and people who own/understand globes on the other.*
—Mr. Doherty to Mr. Lyon, referring to a review of New York City's literacy plan, Aug. 29, 2003

*Confidentially: ...Well, I spoke to [a New Jersey official] with a roomful of others on their end and they are HALTING the funding of Rigby and, while we were at it, Wright Group. They STOPPED the districts who wanted to use those programs. We won in Maine, we won in New Jersey. Morale is sky high across the country. State plans have gone from–on average–crap, to each one being–at least on paper–strong and aligned with [scientifically based reading research], and we have lots of monitoring muscle to flex and [technical assistance] brains to provide. Strong law, great funding, solid, guiding science. We are winning.*
—Mr. Doherty to Mr. Lyon, in reference to the rejection of reading textbooks that they viewed as not meeting federal requirements, Sept. 5, 2003

*Just got off the phone (again) with Randy Dunn. He confirms that [Illinois] has frozen Rockford's RF remainder of $638,633 and we are working on finalizing this together. Please, close hold. There are/will be be consequences for Rockford's idiocy. And kids, unfortunately,*

Case 1:06-cv-02080-HHK    Document 7-2    Filed 03/22/2007    Page 12 of 16

reading—generally speaking, a phonics-based vs. a literature-based approach. Over the past decade, a consensus has emerged that a combination of approaches is best, although there is still considerable debate over how much skills instruction is needed.

*are paying for the decisions of adults, again.*
—Mr. Doherty to Mr. Lyon, Feb. 15, 2005

SOURCE: National Institutes of Health

In response to Mr. Doherty's demands, Illinois tried to send a monitoring team to investigate Rockford's Reading First program. Mr. Thompson refused to cooperate with the state officials and federal consultants who visited, saying the short notice would have disrupted schools' operations. Mr. Doherty then directed the state to freeze the district's funding, and ultimately to withdraw the grant. Those actions prompted another e-mail from Mr. Lyon: "wow – Talk about a guy with smarts, integrity AND balls," he wrote. "I am talking about you Chris."

The principal at Lewis Lemon Elementary sued the district. District officials said a settlement was reached in the case, but could not discuss the details.

"They made all these judgments about us when they knew absolutely nothing about what we were doing," said Mr. Thompson, who added that he was perplexed how the revisions to the reading plan could be perceived as whole language. "We ended up getting into a war of labels."

Mr. Doherty would not comment for this story. Sandi Jacobs, who helped administer Reading First as a senior program specialist with the Education Department, said she and Mr. Doherty believed that the Rockford district was "severely and significantly out of compliance." They then pressed state officials to deal with the matter.

## New York Story

In New York City, federal officials jumped into the fray over reading instruction months before the state even applied for Reading First money. When city Schools Chancellor Joel I. Klein unveiled his plans for a districtwide literacy framework in January 2003, his action drew criticism from a number of reading experts, who argued that a highly structured, phonics-based program would serve students better than the literature- and writing-based plan.

Rod Paige, the U.S. secretary of education at the time, asked Mr. Lyon to help city officials in understanding the research on effective instruction, according to an account of the events Mr. Lyon sent in an e-mail to a prominent reading researcher. A group of researchers associated with the NICHD, Mr. Lyon's agency, then wrote a letter to Mr. Klein detailing why they believed his "balanced literacy" program was not sufficiently research-based. The researchers subsequently met with Deputy Chancellor Diana Lam and other district officials to discuss their evaluation.

"New York City was a big concern, and legitimately so," Mr. Lyon said in an interview this month. "If you put in place a new program that changes the rules, and you have a city like New York get the money and flout the rules, then everyone else would want to do the same thing."

After district officials added a stronger phonics text, one of the researchers involved in the review told *Education Week* she considered it a sound instructional approach. ("N.Y.C. Hangs Tough Over Maverick Curriculum," Oct. 15, 2003.)

## Balanced Literacy Rebuffed

But later in 2003, as New York state was negotiating with federal officials over its final Reading First plan, federal officials and consultants took another stab at persuading city officials to take a

different tack on reading instruction.

In the interview, Mr. Lyon said state officials requested guidance on how New York City could meet Reading First criteria. Sally Shaywitz, a Yale University professor and a member of the National Reading Panel—a congressionally mandated committee that issued an influential 2000 report on reading research—and two other researchers conducted the review.

Mr. Lyon helped arrange for those researchers to meet with Chancellor Klein to outline their findings and discuss how the city's schools could benefit from a commercial core program for reading, instead of the customized framework the city had crafted.

A federal contractor for Reading First oversaw the review and recommended that a task force, consisting of Ms. Shaywitz and other key researchers, be appointed to help the district choose an appropriate program.

Mr. Lyon regularly checked in with Mr. Doherty of Reading First to ask, "Can you brief me on the status of the NYC RF application as I am getting Qs from higher." The request continued: "Did they do the right thing?" Later, Mr. Lyon indicated that there was "WH interest."

The former NICHD branch chief, who managed the $120 million grant program for reading research at the National Institutes of Health in Bethesda, Md., asked another researcher, an author of the Open Court commercial reading curriculum, to help him make the case for a structured, comprehensive core program. Mr. Lyon said he sought advice from the researcher, Marilyn Adams, because of her long-standing reputation in reading research. He did not consider her link to Open Court a conflict of interest because her commitment was to the research first. "I need good data fast," Mr. Lyon wrote to Ms. Adams in August 2003, after describing Mr. Klein's reluctance to adopt "an evidence based program like Open Court" because of the mixed results of the program in other big cities, and the alternative approaches being used in Boston and San Diego. "I think he will listen if we can show gains from evidence based programs."

Mr. Lyon also acknowledges in the e-mail that the text was just one of the essential components, "teachers and implementation being as important."

In e-mails to Margaret Spellings, who was President Bush's chief domestic-policy adviser before becoming education secretary, Mr. Lyon discusses "NY City," according to the subject line. All but one line was redacted under an exemption in the federal freedom-of-information law that considers pending decisions to be confidential. In the end, Mr. Lyon asks, "Let me know if you want me to do anything."

In sharing the message with Mr. Doherty, Mr. Lyon commented: "Gees – this never stops – we have to win this one."

When the Education Department inspector general's report was released, now-Secretary Spellings said that the problems cited "reflected individual mistakes." But at least one former Education Department official has suggested that Ms. Spellings was deeply involved in the program while working at the White House.

"She micromanaged the implementation of Reading First from her West Wing office," Michael J. Petrilli, who worked in the department from 2001 to 2005, under Secretary Paige and Secretary Spellings, wrote in the *National Review Online* last fall. "She was the leading cheerleader for an aggressive approach."

Case 1:06-cv-02080-HHK    Document 7-2    Filed 03/22/2007    Page 14 of 16

Mr. Petrilli, now a vice president of the Thomas B. Fordham Foundation, a Washington think tank, has argued that Mr. Doherty did what officials in the White House and Congress expected him to do.

Ms. Spellings has not responded to the allegations about her role. The Education Department did not respond to a request for comment last week.

New York state was awarded its Reading First grant in September 2003. In the end, New York City relented and chose a commercial reading program—Harcourt Trophies—for its 49 Reading First schools, but stuck with the balanced-literacy program to guide reading instruction at other schools.

The 1.1 million-student district's Reading First funding is considered vulnerable because the inspector general found its grant application should not have been approved, and recommended that the state take back its $107 million grant.

Chancellor Klein would not comment for this article. But in a August 2003 interview with *The New York Times*, he said: "I think it's a 'less filling/tastes great' debate. I don't believe curriculums are the key to education. I believe teachers are."

**Fingerprints Elsewhere**

Many other Reading First details large and small came to the attention of Mr. Lyon and Mr. Doherty between 2003 and 2005, which they discussed by e-mail. Mr. Lyon also visited states to provide guidance on Reading First.

In March 2003, for example, he agreed to meet with a handful of Indiana legislators who requested his advice on ways to ensure that state officials adhered to Reading First mandates. Mr. Lyon suggested the state would need extra monitoring because of the potential for noncompliance, which could send a message to other states of the consequences of not adhering to the requirements. The legislators had suggested to Mr. Lyon that state education officials in Indiana were not ready to abandon its existing reading approach.

After meeting with officials in Louisiana and North Carolina, Mr. Lyon told Mr. Doherty that they needed to discuss various issues of concern, including the assessments and consultants that the states were planning to use under their Reading First grants. The two federal officials discussed Louisiana's desire to use an assessment for Reading First schools that they did not deem research-based, and Mr. Lyon suggested to a North Carolina administrator that a textbook by a well-known reading researcher was inappropriate for use in Reading First training sessions.

Local educators, researchers, community leaders, or parents alerted them to some issues.

One New Jersey parent asked Mr. Lyon for help in July 2003, because state officials were allowing the use of a Wright Group reading program, owned by the McGraw-Hill Cos. She didn't consider the text research-based. Mr. Lyon alerted Mr. Doherty. The Reading First director recalled that "we forced Maine to drop the bad program." By September 2003, nearly a year after New Jersey's grant had been approved, New Jersey officials disallowed funding for the text.

"As you may remember, RF got Maine to UNDO its already made decision to have Rigby be one of their two approved core programs (Ha, ha – Rigby as a CORE program? When pigs fly!) We also as you may recall, got NJ to stop its districts from using Rigby (and the Wright Group, btw) and are doing the same in Mississippi," Mr. Doherty wrote in October 2003. "This is for your FYI, as I think this program-bashing is best done off or under the major radar screens."

In May 2005, Harcourt Achieve Inc., which owns the Rigby Literacy program, issued a press release outlining changes it made to the program to ensure it aligned more closely with research. The changes were prompted, the company said, by deficiencies that were brought to light by the Reading First grant reviews.

And when a Texas consultant informed Mr. Lyon and Mr. Doherty of breaches in that state's Reading First program by the interim state commissioner of education, they debated in a series of e-mail exchanges with a researcher how best to get state officials back in line. They discussed getting influential advisers to the Bush administration, and federal officials with Texas ties, to put pressure on the state education department.

## Hypervigilance Defended

By many accounts, Mr. Doherty, a former director of a Baltimore-based organization that oversees direct-instruction reading, was a tireless leader for the program. Reading First, which has the support of many educators, was intended to bring research-based instruction to the nation's underperforming schools. Mr. Doherty and Ms. Jacobs were essentially the only staff members assigned full time to the program.

Many state officials rallied to his defense when the inspector general's report was released last fall. Reading First recently received the highest performance rating of all NCLB programs from the White House Office of Management and Budget.

"It's not that Reading First was over the top," Ms. Jacobs said. "It's much more that many programs [administered by the Education Department] are severely undermonitored."

Sol Stern, a senior fellow at the conservative Manhattan Institute and an outspoken critic of New York City's reading plan, also defends the hard-line approach.

"If Doherty's sin was to lean on a state education agency or two to promote a reading program backed by science over one that wasn't, well, that's just what the Reading First legislation intended," Mr. Stern, wrote in the Winter 2007 edition of *City Journal*, the institute's magazine.

Mr. Lyon, who is designing a teacher-preparation program for the Dallas-based Best Associates, said this month that the "hypervigilant monitoring" was necessary, but that he did not anticipate how the Reading First mandates would be complicated by the issue of local control.

"Here you have local control, which historically has always been there, and then you have Reading First being very prescriptive," he said.

"In my mind, Reading First has to carry the day," he added.

## 'Shameful Behavior'

Critics, other observers, and some stakeholders alike, however, say the results do not necessarily justify the heavy-handed management. Some vendors claim their reading programs were not given a fair shake. The nonprofit Success for All program, for example, has lost business under the federal initiative, according to founder Robert E. Slavin, despite its extensive research and documented results. Many of the e-mail documents were obtained recently by Mr. Slavin from the National Institutes of Health, more than 18 months after he submitted the request.

Some of the commercial programs that have been widely adopted by Reading First schools did not have any more evidence of effectiveness than others that were not as successful.

"The law said nothing about picking specific programs, it just indicated scientifically based programs. But when we looked at the other programs that were being approved, we saw very little evidence that those were more scientific than the ones we were trying to use," said Gene Wilhoit, who as state superintendent in Kentucky sent letters of complaint to the Education Department questioning the pressure his agency received to reject certain reading programs and assessments.

Mr. Wilhoit, now the executive director of the Council of Chief State School Officers, said, "We didn't feel like [the federal oversight] was just an attempt to hold onto the integrity of the program."

Susan B. Neuman, who helped roll out the program as the Education Department's assistant secretary for elementary and secondary education, agrees. Some of the e-mails were also shared with Ms. Neuman, and in a few of the exchanges, Mr. Doherty indicated he was relaying Ms. Neuman's views on how the program should be carried out.

But in one e-mail to her, Mr. Doherty suggests that she should not be involved in the talks over state applications and implementation. Ms. Neuman, who left the department in January 2003, has said that she was left out of many discussions with state officials.

"They far exceeded their mandate," she said in an interview, referring to Mr. Doherty and other federal officials. "We wanted to figure out ways that we could make Reading First a more powerful intervention [than previous federal programs], but certainly not in micromanaging school districts."

"In the beginning," Ms. Neuman added, "this was an honest effort to make something better, … but this is shameful behavior."

Vol. 26, Issue 24, Pages 1,18

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

CITIZENS FOR RESPONSIBILITY AND      :
ETHICS IN WASHINGTON                 :
                                     :
        Plaintiff,                   :
                                     :
      v.                           :   Civil Action No. 1:06cv02086 (HHK)
                                     :
MARGARET SPELLINGS, et al.,          :
                                     :
        Defendants.                  :
_____:

## [PROPOSED] ORDER

The Court having considered defendants' motion for a stay, plaintiff's opposition thereto and the entire record herein it is hereby

ORDERED that defendants' motion is denied and it is further

ORDERED that defendants are to answer the complaint within three days of this date.


DATED:_____          _____

                                         HENRY H. KENNEDY, JR.
                                         UNITED STATES DISTRICT JUDGE